UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
    :
    :
EILEEN A. CLINTON, on behalf of herself and as,
administratrix of the estate of WILLIAM A.      :
CHAMPAGNE, JR.,
    :          ECF Case
         Plaintiff,
    :       05-Civ-9907 (CS) (LMS)
v.
    :
BROWN & WILLIAMSON  HOLDINGS, INC., as
successor by merger to AMERICAN TOBACCO    :
COMPANY, AND PHILIP MORRIS USA INC.,
    :
         Defendant.
    :
    :
-------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50 OF THE
FEDERAL RULES OF CIVIL PROCEDURE AND MOTION FOR A NEW TRIAL
PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

**TABLE OF CONTENTS**

<div align="right"><b>Page</b></div>

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.    STANDARDS OF REVIEW FOR JUDGMENT AS A MATTER OF LAW
UNDER RULE 50 AND A NEW TRIAL UNDER RULE 59 ......................................... 2

II.   THE COURT FAILED TO GIVE ACCURATE JURY INSTRUCTIONS ..................... 3

      A.    THE COURT ERRED IN ITS INSTRUCTION ON DUTY ............................... 4

      B.    THE COURT ERRED IN ITS INSTRUCTION ON CAUSATION ................... 6

      C.    THE COURT FAILED TO GIVE A PROPER INSTRUCTION ON THE
FIRST AMENDMENT AND NOERR-PENNINGTON DOCTRINE ................ 8

III.  THE COURT admitted IRRELEVANT AND PREJUDICIAL EVIDENCE ................ 10

      A.    THE COURT ERRED IN PERMITTING EVIDENCE OF CONDUCT
OCCURRING AFTER SEPTEMBER 11, 1968 .................................................. 11

      B.    THE COURT ERRED IN PERMITTING EVIDENCE OF INTERNAL
DOCUMENTS FROM OTHER, NON-DEFENDANT, TOBACCO
COMPANIES ...................................................................................................... 14

IV.  PLAINTIFF'S CLAIM FOR NEGLIGENT FAILURE TO WARN SHOULD
HAVE BEEN DISMISSED, OR IN THE ALTERNATIVE, A NEW TRIAL
SHOULD BE GRANTED .............................................................................................. 16

      A.    PLAINTIFF FAILED TO PROVE THAT ATC HAD A DUTY TO
WARN ................................................................................................................. 16

      B.    PLAINTIFF FAILED TO PROVE PROXIMATE CAUSE .............................. 20

V.    NEW YORK LAW PRECLUDES PLAINTIFF'S LOSS OF CONSORTIUM
CLAIM ............................................................................................................................ 22

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Branen,*
    17 F.3d 552 (2d Cir. 1994)...............................................................................3, 10

*Anderson v. Eli Lilly & Co.,*
    79 N.Y.2d 797 (1991) ............................................................................................22

*Ballenger v. Flying J, Inc.,*
    No. 3:07-CV-253, 2008 U.S. Dist. LEXIS 92361 (S.D. Miss. Nov. 13, 2008)......12

*Banks v. Makita, U.S.A., Inc.,*
    226 A.D.2d 659, *leave to appeal denied*, 89 N.Y.2d 805 (1996) ...........................20

*Briggs v. Julia L. Butterfield Mem. Hosp.,*
    104 A.D.2d 626 (2d Dep't 1984).............................................................................23

*Burke v. Spartanics, Ltd.,*
    252 F.3d 131 (2d Cir. 2001)......................................................................................4

*Caronia v. Philip Morris USA, Inc.,*
    No. 06-CV-224, 2011 U.S. Dist. LEXIS 12610 (E.D.N.Y. Jan. 12, 2011) ..............7

*Clinton v. Brown & Williamson Holdings, Inc.,*
    498 F. Supp. 2d 639 (S.D.N.Y. 2007)....................................................................11

*Coleman v. Chesebro-Whitman Co.,*
    262 A.D.2d 265 (2d Dep't 1999) ............................................................................20

*Consorti v. Owens-Corning Fiberglas Corp.,*
    45 F.3d 48 (2d Cir. 1995) ..................................................................................23, 24

*Consorti v. Owens-Corning Fiberglas Corp.,*
    86 N.Y.2d 449 (1995) ............................................................................................23

*Denny v. Barber,*
    576 F. 2d 465 (2d Cir. 1978)...................................................................................12

*DeWitt v. N.Y. State Hous. Fin. Agency,*
    No. 97 Civ. 4651, 1999 U.S. Dist. LEXIS 13057 (S.D.N.Y. Aug. 24, 1999) ..........3

*Di Cola v. SwissRe Holding (N. Am.), Inc.,*
    No. 90 Civ. 3211, 1992 U.S. Dist. LEXIS 11535 (S.D.N.Y. Aug. 5, 1992) ..........11

*Du Bois v. Cmty. Hosp. of Schoharie Co., Inc.*,
   150 A.D.2d 893 (3d Dep't 1989) ......................................................................22

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ..........................................................................................8

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
   136 F.3d 276 (2d Cir. 1998) ........................................................................2, 17

*Gonzalez v. Delta Int'l Mach. Corp.*,
   307 A.D.2d 1020 (2d Dep't 2003) .....................................................................7

*Jaroslawicz v. Engelhard Corp.*,
   No. 84-3641, 1989 U.S. Dist. LEXIS 3332 (D.N.J. Apr. 5, 1989) ....................11

*Jolly v. Troisi*,
   No. 92-5332, 2000 U.S. Dist. LEXIS 6479 (S.D.N.Y. May 11, 2000) ...............13

*Liriano v. Hobart Corp.*,
   92 N.Y.2d 232 (1998) ....................................................................................4, 5

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) ..........................................................................................8

*Mangano v. United Finishing Serv. Corp.*,
   261 A.D.2d 589 (2d Dep't 1999) .....................................................................20

*Manley v. AmBase Corp.*,
   337 F.3d 237 (2d Cir. 2003) .........................................................................3, 17

*Mehtani v. N. Y. Life Ins. Co.*,
   145 A.D.2d 90 (1st Dep't 1989) .......................................................................22

*NLRB v. Local 46*,
   149 F. 3d 93 (2d Cir. 1998) .............................................................................11

*Payne v. Quality Nozzle Co.*,
   227 A.D.2d 603 (2d Dep't 1996) .......................................................................5

*Ramirez v. Sears, Roebuck & Co.*,
   286 A.D.2d 428 (2d Dep't 2001) .......................................................................7

*Rogers v. Westfalia Assoc. Tech., Inc.*,
   485 F. Supp. 2d 121 (N.D.N.Y. 2007) ................................................................4

*Sango v. City of New York*,
   No. 83 CV 5177, 1989 U.S. Dist. LEXIS 18214 (E.D.N.Y. June 19, 1989) ..........11

*Scardefield v. Telsmith Inc.*,
    267 A.D.2d 560 (3d Dep't 1999), *leave to appeal denied*, 94 N.Y.2d 761 (2000) ..................5

*Schiller v. Nat'l Presto Indus., Inc.*,
    225 A.D.2d 1053 (4th Dep't 1996)...........................................................................5

*Secone v. Raymond Corp.*,
    240 A.D.2d 391 (2d Dep't 1997) ...............................................................................5

*Smith v. Stark*,
    67 N.Y.2d 693 (1986) ................................................................................................4

*Tisdale v. Fed. Express Corp.*,
    415 F. 3d 516 (6th Cir. 2005) ..................................................................................12

*Tompkins v. R.J. Reynolds Tobacco Co.*,
    92 F. Supp. 2d 70 (N.D.N.Y. 2000)...........................................................................4

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965)...................................................................................................8

*United States v. Dupree*,
    No. 10-CR-627, 2011 U.S. Dist. LEXIS 55159 (E.D.N.Y. May 23, 2011) ...................12, 13

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006)....................................................................................12

*Woo v. City of New York*,
    No. 93 Civ. 7007, 1997 U.S. Dist. LEXIS 7315 (S.D.N.Y. Aug. 14, 1996) .........................11

## OTHER AUTHORITIES

Fed. R. Civ. P. 50...................................................................................................1, 2, 3

Fed. R. Civ. P. 59(a) ..............................................................................................1, 2, 3

1A PJI 3d 2:120 (2012)..........................................................................................4, 5, 17

## <u>INTRODUCTION</u>

The American Tobacco Company ("ATC") respectfully renews its motion for judgment as a matter of law and alternatively seeks a new trial.  On December 12, 2012, the jury in this case returned a verdict in favor of ATC on Plaintiff's fraudulent concealment claim, but found against ATC on Plaintiff's negligent failure to warn claim.  On December 20, 2012, the Court entered judgment for Plaintiff in the amount of $25,000 for Mr. Champagne's pain and suffering, $20,000 for Plaintiff's loss of consortium, and $1,300,000 for Plaintiff's damages due to Mr. Champagne's death, for a total award of $1,345,000.  ATC now renews its motion under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law and, in the alternative, moves for a new trial under Rule 59.

First, ATC is entitled to judgment as a matter of law because Plaintiff's negligent failure to warn and loss of consortium claims have no merit. Plaintiff failed to prove that ATC had a duty to warn and that any alleged breach of that duty was a proximate cause of Mr. Champagne's illness.  Additionally, New York does not recognize a claim for loss of consortium where the tortious conduct occurs prior to the marriage.  Here, it is undisputed Plaintiff limited her claim against ATC to September 11, 1968.  It is also undisputed that Plaintiff did not marry Mr. Champagne until 1975, long after the alleged tortious conduct ended.

Second, the Court erred by failing to instruct the jury on several elements and doctrines relevant to Plaintiff's claims and ATC's defenses.  With respect to Plaintiff's negligent failure to warn claim, the Court failed to instruct the jury completely on both the duty and causation elements, specifically on when a duty to warn does *not* exist, and on the proper definition of "substantial factor."  Additionally, the Court failed to instruct the jury on First Amendment protection of public debate, and the *Noerr-Pennington* doctrine, both of which protect ATC from

being held liable for the legal acts of engaging in public debate about smoking and health, a topic

of public interest and discussion, and attempting to influence governmental action through lawful

and constitutionally-protected means.

Third, the Court also erred in admitting certain time-barred and irrelevant evidence. The

Court improperly admitted evidence of conduct occurring after September 11, 1968. Since, by

plaintiff's own choice in framing her complaint, ATC could not be held liable for any conduct

after that date, the Court's admission of post-claim evidence served only to inflame and confuse

the jury. The Court additionally erred by admitting irrelevant evidence of internal documents of

other, non-party tobacco companies without requiring evidence that ATC had access to or

knowledge of those documents prior to September 11, 1968. The admission of these documents

thus allowed the jury to hold ATC responsible for the thoughts and actions of non-parties.

## <u>ARGUMENT</u>

I.    **STANDARDS OF REVIEW FOR JUDGMENT AS A MATTER
      OF LAW UNDER RULE 50 AND A NEW TRIAL UNDER RULE 59.**

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law

should be granted when "a party has been fully heard on an issue during a jury trial and the court

finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the

party on that issue." Fed. R. Civ. P. 50(a)(1). The motion should be granted when the evidence

is viewed in the light most favorable to the non-moving party and there remains either "a

complete absence of evidence supporting the verdict" or "such an overwhelming amount of

evidence in favor of the movant that reasonable and fair-minded persons could not arrive at a

verdict against it." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.

1998) (motion for judgment as a matter of law after jury verdict rendered). ATC now renews its

motion for judgment as a matter of law, filed December 3, 2012 (Docket No. 379), in accordance

with Rule 50(b) and incorporates all arguments made therein.  *See* Fed. R. Civ. P. 50(b).  On a renewed motion, "the court may:  (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  *Id.*

ATC also moves in the alternative for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure.  A court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a).  These reasons include where "the verdict is against the weight of the evidence, damages are excessive, the verdict is inconsistent, substantial errors were made in admitting or excluding evidence, or in charging the jury, or because a material issue was improperly submitted or withdrawn from a jury."  *DeWitt v. N.Y. State Hous. Fin. Agency*, No. 97 Civ. 4651, 1999 U.S. Dist. LEXIS 13057, at *2-3 (S.D.N.Y. Aug. 24, 1999) (internal quotation marks and citations omitted).  Moreover, the standard for a Rule 59 motion is even "less stringent" than for Rule 50 motions in that "a new trial . . . may be granted even if there is substantial evidence supporting the jury's verdict, and . . . a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (internal quotation marks omitted).

## II.   THE COURT FAILED TO GIVE ACCURATE JURY INSTRUCTIONS.

A new trial is warranted because the Court did not give complete and accurate jury charges on the duty and causation elements of Plaintiff's negligent failure to warn claim against ATC, and failed entirely to instruct the jury on the First Amendment and the *Noerr-Pennington* doctrine.  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).  "An erroneous instruction, unless harmless, requires a new trial."  *Id.* (finding that the failure to give an instruction on when a duty exists supported by some evidence at trial was

error).  ATC repeatedly objected to the deficiencies in the Court's instructions during the charge

conferences.  *See, e.g.*, 12/5/2012 Trial Tr. at 2476-78 (objecting to duty instruction deficiency),

2492 (joining in Philip Morris USA's causation objection); 12/6/2012 Trial Tr. at 2726-27

(restating duty objection); 12/5/2012 Trial Tr. at 2712 (objecting to lack of First Amendment and

*Noerr-Pennington* instruction).

## A.    THE COURT ERRED IN ITS INSTRUCTION ON DUTY.

The Court erred by failing to give a complete instruction on when a duty to warn does *not*

exist.  Specifically, the Court instructed the jury: "A manufacturer has no duty to warn a person

of a hazard if the person is already aware of it or reasonably should have been aware of it.

Whether a person reasonably should have been aware must be determined according to the age,

experience and development of the person."  12/10/2012 Trial Tr. at 3063.  The Court did not

instruct the jury, as ATC requested, that: "A manufacturer has no duty to warn of a risk posed by

a product that is clearly dangerous or poses an open and obvious risk.  A risk is clear or open and

obvious if a reasonable person would recognize that danger exists through general knowledge,

observation, or common sense."  Defendant's Proposed Instruction No. 13 (Docket No. 332).

ATC's requested instruction more accurately reflects New York Pattern Jury

Instruction 2:120.  The comments to that instruction (*see* 1A NY PJI 3d 2:120, at 760 (2012))

recognize that no duty to warn arises under New York law as to the class of hazards that pose

open and obvious risks.  *See also Burke v. Spartanics, Ltd.*, 252 F.3d 131, 137 (2d Cir. 2001)

(restating the law as: "a reasonable person would not warn of obvious dangers, *i.e.* those dangers

that most all people know about.  As a result, as to these risks, it cannot be negligent to fail to

warn"); *Rogers v. Westfalia Assoc. Tech., Inc.*, 485 F. Supp. 2d 121, 129 (N.D.N.Y. 2007);

*Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 89 (N.D.N.Y. 2000); *Liriano v.*

*Hobart Corp.*, 92 N.Y.2d 232, 241-42 (1998); ); *Smith v. Stark*, 67 N.Y.2d 693, 694 (1986);

*Secone v. Raymond Corp.*, 240 A.D.2d 391, 392 (2d Dep't 1997); *Payne v. Quality Nozzle Co.*, 227 A.D.2d 603, 603 (2d Dep't 1996) ("It is well settled that there is no necessity to warn a customer already aware . . . of a specific hazard . . . <u>or</u> where such risks and dangers are so obvious that they can ordinarily be appreciated by any consumer to the same extent that a formal warning would provide . . . <u>or</u> where they can be recognized simply as a matter of common sense.") (citations omitted) (emphasis added); *see also Scardefield v. Telsmith Inc.*, 267 A.D.2d 560, 563 (3d Dep't 1999), *leave to appeal denied*, 94 N.Y.2d 761 (2000) (citing the "settled rule that a manufacturer owes no duty to warn users of obvious risks and dangers inherent in the use of a product") (citation omitted); *Schiller v. Nat'l Presto Indus., Inc.*, 225 A.D.2d 1053, 1054 (4th Dep't 1996) (no duty to warn of obvious danger).

In contrast, the Court's instruction does not say anything about open and obvious dangers.  By omitting an instruction explaining that a manufacturer has no duty to warn for "open and obvious" defects, the Court improperly took the issue away from the jury's consideration, as the jury would have no reason to consider this unless so instructed.  *See Liriano*, 92 N.Y.2d at 309 ("Because of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question.") (internal citations omitted).

The Court also erred by omitting ATC's proposed language (supported by the same comments to the New York Pattern Jury Instructions) that would allow the jury to consider whether the injured party was, or reasonably should have been, aware of the risks of smoking through "general knowledge, observation, or common sense."  S*ee* 1A NY PJI 3d 2:120, at 760 (2012); *Liriano*, 92 N.Y.2d at 308; *Payne*, 227 A.D.2d at 603.  The Court opined that the inclusion of such considerations was not necessary since "[i]f the person is aware of it through any means, then the manufacturer has no duty to warn . . . ."  12/4/2012 Trial Tr. at 2478.  While

this may be true for subjective awareness, the Court's instruction omitted those bases the jury could have used to determine whether Mr. Champagne objectively should have been aware of the risks of smoking.

ATC offered into evidence scores of newspaper and magazine articles, television programs, educational materials, and public service announcements during the cross-examination of Plaintiff's witnesses, as well as during its case-in-chief, that proved that the health risks of smoking were ordinarily discoverable during Mr. Champagne's lifetime.[1]  By failing to instruct the jury, however, that it was permitted to consider whether this evidence made the risks of smoking "open and obvious" to all individuals in Mr. Champagne's situation through "general knowledge, observation, or common sense," the Court severely prejudiced ATC.  Had the jury been given the full and proper instruction on when a duty to warn does *not* exist, the jury could only have found that the risks of smoking were open and obvious, and that ATC had no duty to warn Mr. Champagne of those risks.  A new trial is thus warranted as a result of this omission.

### B.    THE COURT ERRED IN ITS INSTRUCTION ON CAUSATION.

The Court further erred in its jury instructions by failing to fully define "substantial factor" under the causation element of Plaintiff's negligent failure to warn claim.  Recognizing that New York is a "substantial factor" state, the Court instructed the jury that: "[a]n act or omission is a proximate cause of an injury if it was a substantial factor in bringing about that injury—that is, if it had such an effect in producing the injury that reasonable people would regard it as a cause of the injury.  Plaintiff must prove, by a preponderance of the evidence, that Defendant American Tobacco's failure to warn William Champagne of the health hazards and addictiveness of smoking was a substantial factor in causing William Champagne's injury."

---

[1] *See infra* Part IV.A.

12/10/2012 Trial Tr. at 3066.  In doing so, the Court omitted ATC's proposed explanation of substantial factor, specifically that the jury find that ". . . the injured party would not have sustained the injuries absent the Defendant's conduct, and that there be some direct relation between the injury asserted and the injurious conduct alleged."  Defendant's Proposed Instruction No. 18 (Docket No. 332).

In choosing to omit ATC's proposed definition of "substantial factor," the Court apparently was attempting to harmonize New York case law suggesting that a but-for analysis still fits within the substantial factor test, and how that may apply in a case with multiple defendants.  *See* 12/4/2012 Hr'g Tr. at 2490-95.  The Court's omission, however, severely prejudiced ATC by removing from the jury's consideration a determination of whether Mr. Champagne would have still been injured absent ATC's conduct.  *See Caronia v. Philip Morris USA, Inc.*, No. 06-CV-224, 2011 U.S. Dist. LEXIS 12610, at *35-37 (E.D.N.Y. Jan. 12, 2011) (holding, in tobacco case seeking medical monitoring damages, that New York law requires a plaintiff "to plead and prove that [he] would not require monitoring . . . absent Philip Morris's wrongful conduct"; "New York tort law . . . uses 'substantial factor' to refer to the subset of but for causes that will be said to be the proximate or legal cause of an actionable harm.") (internal citations omitted); *see also*, *Gonzalez v. Delta Int'l Mach. Corp.*, 307 A.D.2d 1020, 1021-22 (2d Dep't 2003) ("Where the evidence adduced reveals the existence of several possible causes of an injury, for one or more of which the defendant is not responsible, a plaintiff cannot recover without proving the injury was sustained wholly or in part by reason of the defendant's negligence.") (internal quotation marks and citations omitted); *Ramirez v. Sears, Roebuck & Co.*, 286 A.D.2d 428, 430-31 (2d Dep't 2001) (same).

ATC argued in its motion for judgment as a matter of law that, *inter alia*, Plaintiff failed to prove proximate cause in her negligent failure to warn claim.  (*See infra* Part III, Docket No. 379).  If the jury was properly instructed on what a finding of "substantial cause" entailed, it likely would have concluded that Mr. Champagne would have suffered his injuries even without ATC's alleged conduct.[2]  A new trial is therefore warranted on this basis.

### C.   THE COURT FAILED TO GIVE A PROPER INSTRUCTION ON THE FIRST AMENDMENT AND *NOERR-PENNINGTON* DOCTRINE.

Plaintiff's claims were barred to the extent that they were premised on ATC's constitutionally protected right to engage in public debate and to petition the government.  *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 564-65, 571 (2001) (tobacco manufacturers have a constitutionally protected interest in communication under the First Amendment); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-70 (1965) (reaffirming that efforts to influence public officials do not give rise to liability "regardless of intent or purpose"); *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961) (defendants could not be held liable for attempting to influence legislative and executive officials concerning the passage and enforcement of legislation).  The jury thus could not find ATC liable for petitioning the government or for participating in public debate.

Despite this clear law, Plaintiff's counsel time and again attacked ATC for engaging in constitutionally protected activity.  Plaintiff's counsel elicited testimony from Dr. Cummings about ATC's petitioning activities regarding warning labels:

Q:   And did American Tobacco oppose labeling requirements for cigarettes?

---

[2] Indeed, ATC presented voluminous evidence during the trial that Mr. Champagne ignored virtually every warning that he received about the dangers of smoking over a thirty year period, strongly suggesting that a warning by ATC would have made no difference to him. *See infra* Part IV.B.

A:      Yes, they did.

Q:      In what way?

A:      They opposed having the warnings on the, on the product.
        They testified before, you know, the political groups that --
        you know, before Congress that was debating this issue,
        that they opposed warnings. They didn't feel that they were
        necessary because it hadn't been proven that smoking
        caused disease.

11/29/2012 Trial Tr. at 1490:1-10.  Dr. Cummings also testified about the 1994 Waxman

Hearings, where tobacco industry CEOs went before Congress to express their views about the

health risks associated with smoking cigarettes:

Q:      And can you just respond to these questions on this item.
        Did executives from certain tobacco companies give a
        sworn statement in Congress about whether nicotine was
        addictive in 1994?

A:      Yes. In April of 1994.

11/29/2012 Trial Tr. at 1614-1615.  Plaintiff then proceeded to play a video clip of the hearings.

*See* Ex. 1148.  Plaintiff's counsel also cross-examined Dr. Schaller about the American Medical

Association's participation in public debate pertaining to warning labels on cigarettes in the

1960s, its lobbying activity regarding Medicaid and Medicare, and its relationship with ATC.

12/4/2012 Trial Tr. at 2455-56 (Q:  "To be fair, the AMA was taking millions of dollars from the

tobacco industry in 1964 when it made the statement to the FTC about warnings, correct?"; Q:

"So you don't know about American Tobacco or any other tobacco company giving money to the

AMA in the 1960s, just to be clear?"; Q:  "Isn't it true that in 1964 the AMA was trying to defeat

Medicare and Medicaid in Congress?"; Q:  "And isn't it true that the AMA was concerned about

alienating southern congressmen and senators from tobacco states?").

        To mitigate the introduction of this evidence, ATC requested two jury instructions to

protect its constitutional rights.  (*See* Def.'s Proposed Jury Instruction Nos. 46, 47, Docket No.

332.)  Taken together, these instructions would have informed the jury that they could not find ATC liable for attempting to influence government action or for engaging in public debate.

The Court's failure to give these instructions prejudiced ATC.  Plaintiff's attacks against ATC for exercising its constitutional rights were not simply made in passing, but rather constituted a theme of her case.  In closing argument, Plaintiff's counsel said to the jury:  "After the Surgeon General report says smoking causes lung cancer, somehow Congress says that the warning should be caution, smoking may be hazardous to your health . . . I'll let leave it to you to decide how it was that such a weak label ended up on the pack in 1966."  12/7/2012 Trial Tr. at 2959.  Plaintiff implied that ATC had acted nefariously by engaging in the political process. A jury instruction was needed to correct this prejudicial implication and to "adequately inform the jury of the law."  *See Anderson*, 17 F.3d at 556.  Thus, omitting these instructions was not harmless and warrants a new trial.

## III.   THE COURT ADMITTED IRRELEVANT AND PREJUDICIAL EVIDENCE.

A new trial is warranted because the Court erred in admitting evidence of (1) tobacco industry conduct occurring after Plaintiff's self-imposed September 11, 1968 claim cut-off, and (2) internal company documents from other, non-party tobacco industry organizations.  ATC objected to these categories of documents before trial began in its Motion in Limine No. 6 (Docket No. 114), and again in its October 22, 2012 "Top Five Objections" letter to the Court (filed on December 6, 2012) (Docket No. 384).  ATC also objected in its "Top Five Objections" letter (and subsequently-filed memorandum) to the introduction of internal documents of other companies.  The Court denied ATC's repeated objections to both categories of documents.

## A.    THE COURT ERRED IN PERMITTING EVIDENCE
##        OF CONDUCT OCCURRING AFTER SEPTEMBER 11, 1968.

Admission of evidence of post-1968 tobacco industry conduct had the precise effect the

Court expressed trepidation over during its motion in limine conference—the post-1968 conduct

became the "dog" in the trial, with the pre-1968 conduct as the "tail."  6/25/2012 Hr'g Tr. at 109.

Plaintiff voluntarily limited her two claims against ATC for fraudulent concealment and failure

to warn to the time period before September 11, 1968.  *Clinton v. Brown & Williamson Holdings,

Inc.*, 498 F. Supp. 2d 639, 642 (S.D.N.Y. 2007).  Thus, in order to prove her claim against ATC

for negligent failure to warn, Plaintiff had to show that ATC breached a duty prior to that date.

Where a plaintiff's claims are subject to a temporal limitation, the same limitation should

govern the scope of the evidence.  *See NLRB v. Local 46*, 149 F. 3d 93, 104 (2d Cir. 1998)

("Evidence of hiring hall deviations occurring long after the action condemned is not relevant or

probative to the issue of whether the Union failed to respect its referral rules at the time of that

action . . . ."); *Woo v. City of New York*, No. 93 Civ. 7007, 1997 U.S. Dist. LEXIS 7315, at *19

(S.D.N.Y. Aug. 14, 1996) ("Plaintiff . . . cannot establish that incidents that occur after the event

in question caused his injury."); *Sango v. City of New York*, No. 83 CV 5177, 1989 U.S. Dist.

LEXIS 18214, at *43 n.2 (E.D.N.Y. June 19, 1989) ("[C]onduct occurring after the incident at

issue lacks the requisite 'affirmative link' to plaintiffs' injuries—that is plaintiffs cannot

establish causation."); *Di Cola v. SwissRe Holding (N. Am.), Inc*., No. 90 Civ. 3211, 1992 U.S.

Dist. LEXIS 11535, at *18 (S.D.N.Y. Aug. 5, 1992) (holding that in suit involving alleged age

discrimination, "the events post-dating plaintiff's termination by three years are irrelevant as a

matter of law"); *Jaroslawicz v. Engelhard Corp*., No. 84-3641, 1989 U.S. Dist. LEXIS 3332, at

*16 (D.N.J. Apr. 5, 1989) (holding post-event evidence "inadmissible to prove the pre-event

intentions of [the defendant]").[3]  Because there was no claim that ATC committed any actionable

wrong after September 11, 1968, evidence of conduct after that date should have been excluded

under Federal Rules of Evidence 402, 403 and 404(b).

The Court nevertheless permitted what it labeled "limited" evidence of post-claim, post-

1968 conduct on the theory that such evidence was probative on the issue of "common

knowledge."  6/25/2012 Hr'g Tr. at 106-10.  But the prejudicial effect of post-claim, post-1968

exhibits substantially outweighed any probative value they may have held on that issue.

Applying Rule 403, the Second Circuit has held that the "prejudicial effect may be created by the

tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite

emotions against the defendant."  *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006)

(citing *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)).  When the evidence's

prejudicial effect substantially outweighs its probative value, it should be excluded.  *See*, *e.g.*,

*Tisdale v. Fed. Express Corp.*, 415 F. 3d 516, 536-37 (6th Cir. 2005) (finding in discrimination

case that evidence of former employee's post-termination employment history should have been

excluded; its probative value was outweighed by potential prejudice, and it had also been offered

for the impermissible purpose of showing the employer's propensity for bad acts); *United States

v. Dupree*, No. 10-CR-627, 2011 U.S. Dist. LEXIS 55159, at *12-14 (E.D.N.Y. May 23, 2011)

(finding that the jury is likely to be "confused and make improper inferences if [Defendant]

move[d] to admit evidence that post-date[d] his charged conduct against his co-defendants");

*Ballenger v. Flying J, Inc.*, No. 3:07-CV-253, 2008 U.S. Dist. LEXIS 92361, at *2-3 (S.D. Miss.

Nov. 13, 2008) (probative value of evidence regarding whether plaintiff failed to follow product-

---

[3] *Cf. Denny v. Barber*, 576 F. 2d 465, 470 (2d Cir. 1978) (dismissing securities fraud suit where "plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.").

dating policies while working for a subsequent employer was substantially outweighed by the danger of confusing and misleading the jury); *Jolly v. Troisi*, No. 92-5332, 2000 U.S. Dist. LEXIS 6479, at *7 (S.D.N.Y. May 11, 2000) (excluding evidence concerning events that occurred during a time period after the events at issue in the plaintiff's complaint).

During trial, Plaintiff admitted a number of exhibits that post-date the claims against ATC. *See*, *e.g.*, Exs. 36, 37, 882, 1148, 1303, and 1305[4]. Though offered under the pretense of proving "common knowledge," the clear purpose of the introduction of these exhibits was to inflame the jury. For example, the only reasonable effect of introducing ATC's statements during a 1994 Congressional hearing—over 25 years after Plaintiff's claims against ATC expired—was to anger the jury and to suggest that ATC was purportedly denying the addictiveness of smoking into the 1990s. *See* Ex. 1148; 11/29/2012 Trial Tr. at 1615. And, by permitting such prejudicial evidence, this Court in effect required ATC to respond to it, thereby enhancing the "tail" to the detriment of the "dog."[5] No limiting instruction or explanation by the Court that ATC could not be held liable for that conduct could temper this outcome.

Furthermore, the use of multiple post-1968 exhibits confused the jury into believing that it could hold ATC liable for actions beyond the September 11, 1968 cut-off date. *Cf. Dupree*, 2011 U.S. Dist. LEXIS 55159, at *13-14. Plaintiff's counsel even called attention to the fact that certain exhibits showed post-claim conduct. *See* 11/29/2012 Trial Tr. at 1611-12 ("Q: Okay. And do you have some example of videos here where some people even after September 11th,

[4] The Court also permitted Plaintiff to play portions of Dr. Robert K. Heimann's (former CEO of ATC) deposition testimony from a 1986 Mississippi state court case for the jury. The Court did so on the basis of a 1987 stipulation which itself expressly "applies" "from 1980 until the present." Its admission, therefore, was also improper given the self-imposed cutoff date of Plaintiff's claims. *See* Ex. A, 11/6/2012 Letter to the Court. (All Exhibits are attached to the accompanying Declaration of Harold K. Gordon.)

[5] In fact, in an attempt to defuse its impact, ATC's counsel felt compelled to play the video of the Congressional hearing during his closing argument. 12/6/12 Trial Tr. at 2782-83.

1968, are still saying that they didn't know?  A:  Yes. . . . Q: Okay.  Was this information,

though, out in the public and being sent out in the public?  A: Yes.  This was part of, you know,

public service announcements that ran in 1971 and '72.").  The only reasonable—and

improper—inference the jury could have made from this was that they indeed could hold ATC

liable for the testimony and exhibits they were just shown.

> **B.    THE COURT ERRED IN PERMITTING EVIDENCE OF INTERNAL
> DOCUMENTS FROM OTHER, NON-DEFENDANT, TOBACCO
> COMPANIES.**

The Court erred in admitting internal documents created and used by other tobacco

companies without evidence that ATC had access to or used such documents.  *See, e.g.*, Exs. 93,

118, 798, 809, 862, 915, 927, 1025, 1041, 1088, 1093, 4497, 4779, and 5209.  The Court

admitted these documents on a notice theory—that what was known by one company

presumably would be shared and known by others.  *See* 10/31/2012 Hr'g Tr. at 181-87.  This

theory, however, never came to fruition during trial.

Under the Court's notice theory, Plaintiff's key expert on tobacco company documents,

Dr. K. Michael Cummings, offered blanket statements that internal information from other

companies was "shared" with ATC and other companies in the Tobacco Institute Research

Committee.  *See, e.g.*, 11/28/2012 Trial Tr. at 1527 ("Q:  And was this another company that

American Tobacco had regular dealings with?  A:  Yes.  In fact, was shared, this – his findings

were shared among American Tobacco and all the other companies as part of the TIRC.").

When questioned about the basis for such an opinion, however, Dr. Cummings repeatedly

admitted that he had no evidence that internal documents from other tobacco companies were

available to ATC or in ATC's company files during the time period relevant to Plaintiff's claims.

The following exchange was typical of Dr. Cummings' testimony on such exhibits:

MR. KACZYNSKI:  Could we pull up Plaintiff's Exhibit 927, please.  Okay.  If we could go to the top of the page.

Q:    Now, this is an exhibit you showed the jury yesterday, right, Doctor?

A:    It is.

Q:    And the date is March 15th, 1961?

A:    Yes.

Q:    And this is not an American Tobacco Company document, correct?

A:    No, it is not.

Q:    As a matter of fact, this wasn't prepared by any tobacco company, correct?

A:    It was prepared under contract for one of the other tobacco companies.

Q:    By an outside consultant named Arthur D. Little, correct?

A:    That's right.  Arthur D. Little Labs.

Q:    And this particular document came from that other company's files?

A:    It did.  That's where I got it.

Q:    And you have no evidence that this document ever was in the files of the American Tobacco Company?

A:    I have no evidence one way or the other.

Q:    Because you haven't looked?

A:    I haven't.  I haven't done that check, no.

11/29/12 Trial Tr. at 1661:22-1662:22.  *See also* 11/29/12 Trial Tr. at 1652:19-1653:25;

1657:20-1659:10; 1659:11-1660:9; 1660:11-7, 18-21; 1662:23-1664:1; 1664:2-6, 1665:14-17

(all substantially the same).

15

Again and again, Dr. Cummings admitted that his opinion that other companies' internal documents were "shared" had no factual basis. His opinions, and the internal other-company documents offered into evidence through his testimony, are thus left with very little—if any at all—probative value on Plaintiff's claims.

In short, there was no evidence to support the Court's initial reasoning for admitting such documents—that what was known by one company would also presumably be known by ATC. Without such information, the jury was left to speculate and assume that ATC had information that was buried in the internal documents of its competitors. This in turn left the jury free to improperly impose liability on ATC for the actions of its competitors. Because the Plaintiff was unable to establish the necessary connection between ATC and the other companies that authored the internal documents, their admission into evidence substantially prejudiced ATC. That prejudice warrants a new trial.

## IV. PLAINTIFF'S CLAIM FOR NEGLIGENT FAILURE TO WARN SHOULD HAVE BEEN DISMISSED, OR IN THE ALTERNATIVE, A NEW TRIAL SHOULD BE GRANTED.

As set forth in ATC's motion for judgment as a matter of law (*See* Docket No. 379), Plaintiff failed to prove two essential elements of her claim for negligent failure to warn, specifically that ATC had a duty to warn, and that ATC's alleged breach of that duty was a proximate cause of Mr. Champagne's injury. Accordingly, the Rule 50 motion should have been granted, and alternatively, a new trial is required under Rule 59.

### A. PLAINTIFF FAILED TO PROVE THAT ATC HAD A DUTY TO WARN.

As detailed in ATC's Rule 50 motion, Plaintiff failed to prove that ATC had a duty to warn. Further, the evidence offered by ATC dwarfs Plaintiff's evidence on this point. As such, the jury's finding that ATC had a duty to warn (*see* Verdict Form, Question 2), is against the

weight of the evidence and warrants a new trial.  *Cf. Manley v. AmBase Corp.*, 337 F.3d 237, 245

(2d Cir. 2003) (internal quotation marks omitted) (holding that a new trial should be granted

where the jury's verdict is "against the weight of the evidence"); *Galdieri-Ambrosini v. Nat'l*

*Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (judgment as a matter of law should be

granted where there remains "such an overwhelming amount of evidence in favor of the movant

that reasonable and fair-minded persons could not arrive at a verdict against it").

As the Court correctly instructed the jury, a product manufacturer has a duty to warn of

dangers of the product of which it knew or should have known and "which the user of the

product ordinarily would not discover."  12/10/2012 Trial Tr. at 3064.  *See also* NY PJI 3d 2:120

(2012).  The evidence adduced at trial showed that Plaintiff failed to meet her burden on this

issue.  To the contrary, the evidence demonstrated that anyone—including Mr. Champagne—

could have ordinarily discovered the risks of smoking.  Plaintiff's expert, Dr. Cummings,

testified that starting when Mr. Champagne was born—and even before he was born—

information pertaining to the risks of smoking, including lung cancer and addictiveness or

difficulty stopping, was widely disseminated:

- It has been well known in the United States for more than 100 years that it can be difficult for people to quit smoking.  11/29/2012 Trial Tr. at 1754.  Smoking has been referred to as addictive for over 100 years.  *Id.* at 1754; *see also* 11/30/2012 Trial Tr. at 2034 (Plaintiff's expert Dr. Grunberg testifying that dating back to the 1700's, there has been an understanding in the lay public that smoking can be hard to quit); 11/30/2012 Trial Tr. at 2035 (Dr. Grunberg testifying that it was readily discoverable to smokers for many years that smoking can be extremely hard to quit).

- Reader's Digest was the most popular publication in the U.S. in the 30s, 40s, and 50s.  11/29/2012 Trial Tr. at 1675.  Reader's Digest articles from the 1930s, 40s, and 50s reported on the addictive nature of tobacco and cigarette smoking and referred to nicotine as a drug.  *Id.* at 1756-62.

- As early as 1938, Reader's Digest used the term "addiction" in the context of cigarette smoking.  *Id.* at 1758.  In 1940, Reader's Digest discussed nicotine in an article about cigarette smoking.  *Id.* at 1758-59.  In 1941, Reader's Digest reported "you do get a lift

when you light a cigarette, but it's exactly like the lift you get from cocaine, heroin, marijuana."  *Id.* at 1760.  The same article referred to nicotine as a poison.  *Id.* at 1760-61.

- In 1950, the year Mr. Champagne was born, the most popular periodical in America was telling its readership "nicotine is the essential ingredient of tobacco.  It's what makes tobacco, tobacco, not just another weed."  *Id.* at 1677.  The same article reported on Drs. Wynder and Graham's study, which found a statistical association between cigarette smoking and lung cancer.  *Id.* at 1678-79.  Also in 1950, Drs. Doll and Hill conducted a study in Great Britain, which likewise concluded that there was evidence to support a link between smoking and lung cancer.  The study received publicity in the U.S.  *Id.* at 1680.

- In 1952, Reader's Digest published an article entitled "Cancer By The Carton," and Dr. Cummings agreed that the theme of the article is when you buy a carton of cigarettes you are buying a carton of cancer.  *Id.* at 1691-92.  Also in 1952, Time Magazine reported that "there is a definite relationship between smoking and lung cancer," based on Drs. Doll and Hill's 1952 study.  *Id.* at 1692-93.

- In 1953, Drs. Wynder and Graham conducted a study in which they painted cigarette tar on the backs of mice and cancerous tumors developed.  The study received tremendous publicity in the lay press, including in Time and Life magazines.  *Id.* at 1693-97.  Time Magazine reported that "this shows conclusively that there is something in cigarette smoke which can produce cancer."  *Id.* at 1695.

- In 1954, Drs. Hammond and Horn released the preliminary results of the American Cancer Society prospective study.  The study "got wide coverage," *id.* at 1685, including in Time and Life magazines.  *Id.* at 1685-91.  Time Magazine reported, "figures prov[e] that heavy cigarette smokers die younger than non-smokers—mainly from heart disease and cancer, notably cancer of the lung."  *Id.* at 1687.

- In 1955, the television show "See It Now" ran two full programs on smoking and health. It was broadcast in homes all across the U.S.  *Id.* at 1698.  Dr. Hammond, who was the statistical director of the American Cancer Society, was asked on the show whether the public should be warned of the risk of lung cancer, and "he said they are being warned." *Id.* at 1718-20.

- In 1957, U. S. Surgeon General Dr. Leroy Burney was asked at a Congressional Hearing whether warning labels were necessary, and Dr. Burney stated that the public had been informed "through the excellent coverage of the press, radio, and TV."  *Id.* at 1722-23; *see also id.* at 1716, 1724 (Dr. Heller, head of the National Cancer Institute, told Congress "Newspaper, radio, TV and other media have done an excellent job covering this problem, and a very objective job.  This is an exceedingly valuable way of informing the public.").

- Also in 1957, Drs. Hammond and Horn released the final results of their prospective study, and it was reported on in Time Magazine.  *Id.* at 1726-27.  Time Magazine called smoking and lung cancer "a spectacular relationship."  *Id.*

- The Royal College of Physicians' Study, which concluded unequivocally that smoking caused lung cancer, was reported throughout the U.S., including in Reader's Digest. 11/29/2012 Trial Tr. at 1650, 1735-36.

- The Surgeon General's Report was released on January 11, 1964, and it concluded that cigarette smoking was causally related to lung cancer in men. *Id.* at 1739-40, 1742. The release of the report was a historical event. It was front page news all across the country, often above the fold, and it was covered in many major news magazines, including Time, U.S. News & World Report, Life, Reader's Digest, and Newsweek. *Id.* at 1742-43. The Report was also the major lead story on the three television networks. *Id.* at 1743-44.[6]

Similarly, ATC's expert historian, Dr. Schaller testified that the risks of smoking were ordinarily discoverable to anyone in Mr. Champagne's situation. *See* 12/3/2012 Trial Tr. at 2141-45 (1950 Wynder & Graham study); 2146-47 (1951 British studies); 2147-49 (1952 Drs. Doll & Hill study);  2149-50 (1952 "Cancer by the Carton" Reader's Digest article); 2151-53 (1953 mouse skin painting study); 2150-51 (1953 Roswell Park cancer center); 2155-57 (1954 Hammond & Horn study); 2158-59 (1954 Public Health Cancer Association coverage); 2160-62 (1955 See It Now coverage); 2162 (1956 American Cancer Society study); 2162-63 (1957 final Hammond & Horn study); 2163-67 (1957 Seven Experts study); 2171-72 (1958 veterans' study); 2172-73 (1959 cigarette chemical composition Time Magazine article); 2175-78 (1962 Royal College of Physicians report); 2182-86 (1964 Surgeon General's Report); 2221-24 (Regent's Exam); 2228-29 (Senior Scholastic); and 2214-20 (school textbooks). As Dr. Schaller pointed out, even evidence of information publically available when Mr. Champagne was still a child is relevant to this point because "[i]t suggests the public was hearing, listening, concerned, people around him who would influence him, his parents, aunts, uncles, teachers would all be aware of this as he comes of age." 12/3/2012 Trial Tr. at 2150.

---

[6]  Indeed, Plaintiff's expert, Dr. Cummings, expressed his belief that the issuance of the Report in 1964 was such a landmark in American history that it merited a commemorative postage stamp on the 50th anniversary of its release next year. 11/29/2012 Trial Tr. at 1639.

The evidence of the widespread publicity of the health risks of smoking demonstrated that a consumer could ordinarily discover the risks of smoking and therefore negated the duty element of Plaintiff's negligent failure to warn claim.

**B. PLAINTIFF FAILED TO PROVE PROXIMATE CAUSE.**

Even if ATC had a duty to warn Mr. Champagne of the risks of smoking, Plaintiff also failed to prove that any failure to warn was a proximate cause of his injuries. *See Coleman v. Chesebro-Whitman Co.*, 262 A.D.2d 265, 266 (2d Dep't 1999) (granting summary judgment where plaintiffs failed to show "in what way the lack of such warnings was a proximate cause" of plaintiffs' injuries); *Mangano v. United Finishing Serv. Corp.*, 261 A.D.2d 589, 590 (2d Dep't 1999); *Banks v. Makita, U.S.A., Inc.*, 226 A.D.2d 659, 660 (2d Dep't), *leave to appeal denied*, 89 N.Y.2d 805 (1996).

There was no evidence introduced at trial that Mr. Champagne would not have started to smoke, or would have stopped sooner than he did, if there had been additional warnings on cigarette packages. In fact, all the evidence pointed in the opposite direction:

- Family History of Smoking-Related Illnesses: Mr. Champagne learned that cigarettes can cause cancer when his Uncle Steve died of throat cancer caused by smoking in 1980. 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 80-81, 459)[7]; 11/26/2012 Trial Tr. at 1035 (Janet Tatko testifying that her husband died in 1980). Yet there is no evidence that Mr. Champagne ever attempted to quit smoking prior to 1986. 11/15/2012 Trial Tr. at 350 (Plaintiff has no knowledge of Mr. Champagne trying to quit before he switched to Marlboro Lights in 1986); 11/29/2012 Trial Tr. at 1773. Additionally, Mr. Champagne's father died of emphysema in 1991, 11/26/2012 Trial Tr. at 1068-69 (Janet Tatko), and Mr. Champagne's brother Joe testified that their family members connected the emphysema to smoking. 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 97).

[7] Because the videotaped deposition designations played for the jury during trial were not transcribed onto the record, ATC cites herein to the deposition transcript page numbers for the Court's convenience. *See* Docket No. 386 (designated deposition transcript of Joseph Champagne).

- <u>Stretch Valente:</u>  Plaintiff admitted that, at the latest, Mr. Champagne was aware that smoking can cause lung cancer in 1985, when one of his best friends—Stretch Valente—was diagnosed with lung cancer caused by smoking.  11/15/2012 Trial Tr. at 235-36, 375; *see also* 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 152-53).  Plaintiff had many conversations with Mr. Champagne between 1985 and Stretch Valente's death in 1986 in which she encouraged him to quit.  11/15/2012 Trial Tr. at 329.  Mr. Champagne said he would quit when Stretch died.  *Id.* at 250, 330.  Plaintiff encouraged him not to wait—to quit right away, but Mr. Champagne continued smoking throughout Stretch Valente's illness.  *Id.* at 330, 375.  When Stretch Valente passed away in 1986, Mr. Champagne continued to smoke, and did so for another 17 years.  *Id.* at 375.

- <u>Plaintiff:</u>  Mr. Champagne's wife encouraged her husband to quit smoking starting in 1985.  11/15/2012 Trial Tr. at 243-44, 329, 375.  Despite these urgings, he continued smoking.  *Id.* at 375-76.  From 1986 through the end of the 1980s, Ms. Clinton encouraged Mr. Champagne to quit three or four times per week—she nagged him.  *Id.* at 340; *see also* 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 64) (Joseph Champagne testifying that Ms. Clinton "hounded" Mr. Champagne); *id.* at 1059 (Janet Tatko testifying that Ms. Clinton tried to get Mr. Champagne to quit).  She continued to encourage him or nag him to quit a couple times a week in the 1990s and 2000s, up to 2003.  11/15/2012 Trial Tr. at 341.  From 1987 forward, when Ms. Clinton encouraged Mr. Champagne to quit, his response was simply, "Yeah, yeah, yeah.  Get off my ass."  *Id.* at 1073 (video deposition of Joseph Champagne at 69).

- <u>Jennifer Champagne and William ("Billy") Champagne, III:</u>  When Mr. Champagne's children encouraged him to quit, he continued smoking.  11/15/2012 at 376.  Jennifer Champagne, Mr. Champagne's daughter, talked to him "it seemed like all the time" to try to get him to quit.  11/16/2012 Trial Tr. at 443; *see also* 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 58).  Joseph Champagne, Mr. Champagne's brother, testified that Mr. Champagne responded by saying "Mind your business.  I bought them, I'm smoking 'em . . . ."  11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 60).  Despite these attempts, Jennifer never saw him stop smoking until 2003.  *Id.* at 468.  From the time his son, Billy, was 10 years old, he talked to his father about quitting smoking.  11/20/2012 Trial Tr. at 934.  When told to quit, Mr. Champagne would respond "leave me alone, leave me be . . . I know it's bad for me, but leave me alone." *Id.* at 944-45.

- <u>Joe Champagne and Other Family Members:</u>  Mr. Champagne told his brother several times that he was not going to quit smoking.  11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 70-71, 181).  Mr. Champagne's other brother, Ken, also encouraged Mr. Champagne to quit, to which he would respond, "fuck off." 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 92, 94).  Mr. Champagne's Aunt Janet Tatko also told him he should stop smoking.  11/26/2012 Trial Tr. at 1060.

- <u>Medical Warnings:</u>  Mr. Champagne's doctor encouraged him to quit in 2000, but he continued to smoke.  *Id.* at 376-77.  He also continued to smoke even while using

nicotine gum and the nicotine patch.  *Id.* at 377, 383;  11/16/2012 Trial Tr. at 448; 11/20/2012 Trial Tr. at 936-37.

- Warning Labels and Common Sense:  Mr. Champagne noticed the warning label on the cigarette pack and discussed the warning with his brother Joseph Champagne. 11/26/2012 Trial Tr. at 1073 (video deposition of Joseph Champagne at 160).  His brother also testified that Mr. Champagne realized during the whole time that he smoked, that by inhaling smoke into his lungs, it wasn't good for his health.  *Id.* (video deposition of Joseph Champagne at 163).

Despite being bombarded with warnings about the health risks of smoking and pleas from those close to him, Mr. Champagne decided to continue smoking.  Nothing ATC did—or didn't do—prior to September 11, 1968 caused Mr. Champagne's injuries.[8]

Because Plaintiff failed to prove the duty and proximate cause elements of her negligent failure to warn claim, that claim should have been dismissed, and in the alternative, a new trial should be granted on those grounds.

## V.    NEW YORK LAW PRECLUDES PLAINTIFF'S LOSS OF CONSORTIUM CLAIM.

The loss of consortium claim against ATC should not have been submitted to the jury. New York law is clear.  "[A] claim for loss of consortium is not permitted unless [the] surviving spouse was married to the injured person at the time of the actionable conduct."  *Du Bois v. Cmty. Hosp. of Schoharie Co., Inc*., 150 A.D.2d 893, 894 (3d Dep't 1989).  *See also Anderson v. Eli Lilly & Co*., 79 N.Y.2d 797, 798-99 (1991) (no recovery for loss of consortium where injured spouse exposed to toxic drug before marriage, but injury did not manifest until after marriage); *Mehtani v. N. Y. Life Ins. Co*., 145 A.D.2d 90, 95 (1st Dep't 1989) ("damages for loss of

---

[8] Plaintiff cannot avoid her burden to prove proximate cause by claiming that Mr. Champagne was "addicted."  First, there is no dispute here that smokers—including heavily "addicted" smokers—can and do quit smoking.  Plaintiff's experts, Dr. Cummings and Dr. Grunberg, so testified.  *See* 11/29/2012 Trial Tr. at 1768; 11/30/2012 Trial Tr. at 2066; *see also id*. at 2055 (Dr. Grunberg testifying that 60 million people have quit smoking). Second, there is no dispute that Mr. Champagne was able to and, in fact, did quit smoking when sufficiently motivated.  11/15/2012 Trial Tr. 341; Trial Tr. 11/20/12 at 936-37.

consortium are not recoverable where, as here, the alleged wrongful conduct preceded the marriage"); *Briggs v. Julia L. Butterfield Mem. Hosp.*, 104 A.D.2d 626, 626 (2d Dep't 1984) ("An action for loss of consortium cannot be maintained unless the plaintiff was married to the injured person at the time of the actionable conduct"). Plaintiff married Mr. Champagne on November 1, 1975, more than seven years *after* Plaintiff's claims against ATC ended. *See* 11/15/12 Trial Tr. at 223. But all of the tortious conduct alleged against ATC and the alleged resulting addiction occurred *before* their marriage. As such, Plaintiff's claim for loss of consortium against ATC should have been dismissed.

Questioning the applicability of this rule in a similar context, the Second Circuit certified to the New York Court of Appeals the question of "whether a cause of action lies for loss of consortium where, prior to the marriage, the plaintiff's spouse was exposed to, and ingested, a substance that remained in his body and eventually caused illness, but the illness did not occur until after the marriage." *See Consorti v. Owens-Corning Fiberglas Corp.*, 45 F.3d 48, 49 (2d Cir. 1995). In answering the question, the New York Court of Appeals surveyed sixty years of precedence and unanimously concluded that a loss of consortium claim could not lie under New York law. To the contrary, explained the Court, it is "settled New York law" that "consortium represents each marital partner's interest in the continuance of the marital relationship as it existed at the inception of the marriage," and, as a result, "a loss of consortium cause of action by the spouse of an injured person does not lie if the alleged tortious conduct and resultant injuries occurred *before* marriage." *See Consorti v. Owens-Corning Fiberglas Corp.*, 86 N.Y.2d 449, 454 (1995) (internal quotation marks and citation omitted) (emphasis added). Accordingly, the plaintiff in *Consorti* could not recover for loss of consortium.

Here, neither party disputes that the alleged tortious conduct occurred before Plaintiff married or even met Mr. Champagne. But it is also telling that both Plaintiff and ATC agree that the alleged effect of ATC's conduct on Mr. Champagne also had to be complete by September 11, 1968, in order for Plaintiff to prove her claim. In deciding the case, the jury answered this question: "Has Plaintiff proven, by a preponderance of the evidence, that American Tobacco's breach of its duty to warn, *prior to September 11, 1968*, was a proximate cause of William A. Champagne, Jr.'s injury?" (Ex. B, ¶ 4) (emphasis added). The only way to link ATC's conduct decades ago to Mr. Champagne's lung cancer and death in the 2000s is by way of addiction. So, throughout the trial, Plaintiff's counsel argued that Mr. Champagne's addiction as a teenager led to his lung cancer years later. During closing argument, Plaintiff's counsel argued that "the addiction that took hold when [Mr. Champagne] was a young person" was a "substantial factor in causing him to continue smoke" and "a cause of his lung cancer." 12/7/12 Trial Tr. 2964:5-13. Thus, under Plaintiff's theory of the case—the only theory under which she could recover—Mr. Champagne's addiction was complete before they were married.

Plaintiff here is like the plaintiff in *Consorti*. Although Mr. Consorti's illness did not manifest until years after the marriage, his spouse could not recover because the conduct that "eventually caused his illness" occurred prior to the marriage. *Consorti*, 45 F.3d at 49. Put another way, "at the *inception* of the marriage," the asbestos had already affected Mr. Consorti. *See id.* When Mr. Champagne married Plaintiff, he, too, was already affected by the allegedly tortious conduct. Otherwise, Plaintiff cannot prove causation.

Thus, Plaintiff has no viable loss of consortium claim, and submitting the claim to the jury was error.

## CONCLUSION

For the foregoing reasons, ATC respectfully requests that the Court enter an order granting ATC's Motion for Judgment as a Matter of Law, or in the alternative, granting ATC's Motion for a New Trial.

Dated: New York, New York
   January 16, 2013

Respectfully submitted,

JONES DAY

By: s\:  Harold K. Gordon
  Harold K. Gordon
  hkgordon@jonesday.com
  Robert Iscaro
  riscaro@jonesday.com
  222 East 41st Street
  New York, New York 10017
  (212) 326-3939

  Stephen J. Kaczynski
  skaczynski@jonesday.com
  Jacqueline M. Pasek
  jmpasek@jonesday.com
  901 Lakeside Avenue
  Cleveland, Ohio  44114
  (216) 586-3939

  Kimberly A. Jolson
  kajolson@jonesday.com
  325 John H. McConnell Boulevard
  Suite 600
  Columbus, OH 43215
  (614) 469-3939

  *Attorneys for Defendant*
  *Brown & Williamson Holdings, Inc., as*
  *successor by merger to The American*
  *Tobacco Company*