UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

EILEEN A. CLINTON, on behalf of herself
and as Administratrix of the Estate of
WILLIAM A. CHAMPAGNE, JR.,

                              Plaintiff,

– against –

BROWN & WILLIAMSON HOLDINGS, INC., as
successor by merger to AMERICAN TOBACCO
COMPANY, and PHILIP MORRIS USA INC.,

                              Defendants.

-------------------------------------------------------x

**OPINION AND ORDER**

No. 05-CV-9907 (CS)

<u>Appearances</u>:

Jerome H. Block
Amber Long
Levy Phillips & Konigsberg, LLP
New York, New York
*Counsel for Plaintiff*

Harold K. Gordon
Robert Iscaro
Jones Day
New York, New York

Stephen J. Kaczynski
Jacqueline M. Pasek
Jones Day
Cleveland, Ohio

Kimberly A. Jolson
Jones Day
Columbus, Ohio
*Counsel for Defendant Brown & Williamson Holdings, Inc., as successor by merger to The American Tobacco Company*

Seibel, J.

Before the Court are Defendant The American Tobacco Company's Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50 and Motion for a New Trial pursuant to Federal Rule of Civil Procedure 59, (Doc. 393), and Plaintiff Eileen A. Clinton's Motion to Modify Judgment to Include Pre- and Post-Judgment Interest and for a New Trial on Certain Elements of Damages pursuant to Federal Rule of Civil Procedure 59, (Doc. 391).  For the reasons stated below, Defendant's Rule 50 Motion is DENIED; Defendant's Rule 59 Motion is DENIED; and Plaintiff's Rule 59 Motion is GRANTED IN PART and DENIED IN PART.

## I.  **Background**

The parties are presumed to be familiar with the background facts of this case, which are recounted in other opinions.  *See Clinton v. Brown & Williamson Holdings, Inc.¸* 652 F. Supp. 2d 528 (S.D.N.Y. 2009); *Clinton v. Brown & Williamson Holdings, Inc.*, 498 F. Supp. 2d 639 (S.D.N.Y. 2007).  Between November 15, 2012 and December 12, 2012, a jury trial was held in part on Plaintiff Eileen A. Clinton's negligent failure to warn and fraudulent concealment claims against Defendant The American Tobacco Company ("ATC").  The jury found for ATC on the fraud claim but returned a verdict for Plaintiff on the negligent failure to warn claim, awarding $1,300,000 for decedent William A. Champagne, Jr.'s wrongful death, $25,000 for Champagne's pain and suffering, and $20,000 for Plaintiff's loss of consortium.  (Doc. 389.)

## II.  **Legal Standard**

### A.  *Federal Rule of Civil Procedure 50*

ATC renews its previously-filed motion for judgment as a matter of law, (Doc. 379), pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, which provides:

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:

   (1) allow judgment on the verdict, if the jury returned a verdict;

   (2) order a new trial; or

   (3) direct the entry of judgment as a matter of law.

In considering a Rule 50 motion, the Court must "consider the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences from the evidence that the jury might have drawn in that party's favor."  *Okemo Mountain, Inc. v. Sikorski*, 303 F. App'x 938, 940 (2d Cir. 2008) (summary order) (internal quotation marks omitted); *accord Sharpley v. Metro North Commuter R.R.*, No. 06-CV-7884, 2009 WL 855790, at *2 (S.D.N.Y. Mar. 27, 2009).  The Court may not, in assessing the evidence, "'make credibility determinations or weigh the evidence. . . . [T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *EEOC v. Everdry Mktg. & Mgmt., Inc.*, No. 06-CV-5430, 2009 WL 3287570, at *1 (2d Cir. Oct. 14, 2009) (summary order) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).  "The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury."  *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).  The Court may not disturb a jury verdict unless "there is 'such a complete

absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,'" *Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 75 (2d Cir. 2004) (quoting *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir. 2001)), or "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [*sic*] could not arrive at a verdict against the moving party," *Okemo Mountain*, 303 F. App'x at 940 (alteration and internal quotation marks omitted); *accord Sharpley*, 2009 WL 855790, at *2.

   B.  *Federal Rule of Civil Procedure 59*

   Rule 59 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  A motion for a new trial "may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

   Whether to grant a new trial pursuant to Rule 59(a) is in the district court's sound discretion.  *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 143 (2d Cir. 1998).  It is well-settled that a new trial may be ordered even if there is "substantial evidence" supporting the jury's verdict. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  The court, however, should only grant a new trial where it finds the jury's verdict to be "egregious." *Id.* (citation omitted).  In other words, a Rule 59(a) motion "ordinarily should not be granted unless the trial

court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006) (alterations and internal quotation marks omitted); *accord Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005) (district court must determine, "in its independent judgment, [that] the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice") (second alteration in original) (internal quotation marks omitted); *DeWitt v. N.Y. State Hous. Fin. Agency*, No. 97-CV-4651, 1999 WL 672560, at *1 (S.D.N.Y. Aug. 26, 1999) ("In evaluating a Rule 59 motion, the trial judge's duty is essentially to see that there is no miscarriage of justice.") (internal quotation marks omitted).

In considering whether a jury's verdict is against the weight of the evidence such that a new trial is warranted, the district judge is "free to weigh the evidence and assess the credibility of the witnesses and need not view the evidence in the light most favorable to the verdict winner." *Scherer v. Kane*, 284 F. App'x 850, 854 (2d Cir. 2008) (summary order) (alteration and internal quotation marks omitted).  Nevertheless, "it is still improper for the Court to grant a new trial when resolution of the issues depended on assessment of the credibility of the witnesses." *Ellis v. La Vecchia*, 567 F. Supp. 2d 601, 610 (S.D.N.Y. 2008) (internal quotation marks omitted); *accord DLC Mgmt. Corp.*, 163 F.3d at 134 ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.").

## III.  Discussion

ATC asserts that it is entitled to judgment as a matter of law, or alternatively a new trial, because the Court admitted irrelevant and time-barred evidence and erred in aspects of its jury instructions; Plaintiff did not satisfy her evidentiary burden on two elements of her negligent failure to warn claim; and New York law does not recognize a claim for loss of consortium

where the tortious conduct occurred prior to marriage.  (D's 50/59 Mem. 1-2.)[1]  Plaintiff

responds that there were no errors in the Court's evidentiary rulings or jury instructions; she

presented substantial evidence in support of all elements of her negligent failure to warn claim;

and the loss of consortium claim was properly submitted to the jury.  (P's 50/59 Opp. 1.)[2]

Plaintiff moves for the judgment to be amended to include pre-and post-judgment interest

and seeks a new trial on the damages awards of $25,000 for Champagne's pain and suffering,

$20,000 for Plaintiff's loss of consortium, and zero for the losses of Champagne's children,

Jennifer and William, Jr. (to whom I will refer as Billy).  (P's 59 Mem. 1.)[3]  ATC opposes a new

trial on damages, arguing that the jury's assessment of the credibility of the trial witnesses should

not be disturbed, and that the issues of liability and damages are inextricably linked and cannot

be severed.  (D's 59 Opp. 1.)[4]

A. *Evidentiary Rulings*

1. Conduct Occurring After September 11, 1968

ATC argues that because Plaintiff voluntarily limited the two claims against ATC to the

period before September 11, 1968, the same temporal limitation should have applied to the

evidence admitted at trial.  (D's 50/59 Mem. 11.)  Specifically, ATC identifies six exhibits post-

dating 1968 that it alleges inflamed and confused the jury by making it seem as if ATC could be

liable for post-1968 conduct.  (*Id.* at 13-14.)

---

[1] "D's 50/59 Mem." refers to Memorandum of Law in Support of Defendant's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50 of the Federal Rules of Civil Procedure and Motion for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure.  (Doc. 395.)

[2] "P's 50/59 Opp." refers to Plaintiff's Opposition to Defendant the American Tobacco Company's Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50 and Motion for a New Trial Pursuant to Fed. R. Civ. P. 59.  (Doc. 399.)

[3] "P's 59 Mem." refers to Plaintiff's Motion to Modify Judgment to Include Pre and Post-Judgment Interest and Motion for New Trial on Certain Elements of Damages Only.  (Doc. 391.)

[4] "D's 59 Opp." refers to The American Tobacco Company's Opposition to Plaintiff's Motion to Modify Judgment to Include Pre and Post-Judgment Interest and Motion for New Trial on Certain Elements of Damages Only.  (Doc. 398.)

ATC's Motion *in Limine* No. 6, (Doc. 114), and October 22, 2012 letter, (Doc. 384 Ex. A), sought to exclude all evidence of post-1968 conduct before trial.  I denied these motions, stating that some post-1968 evidence was relevant to assessing whether the health hazards and addictiveness of smoking were common knowledge pre-1968,[5] and that I would rule on the admissibility of evidence on a case-by-case basis at trial.  (*See* 6/25/12 Tr. 108-10; 10/31/12 Tr. 175-80.)  At trial, I gave the jury limiting instructions regarding post-1968 evidence, cautioning that it was only to be used to assess whether the health risks and addictiveness of smoking cigarettes were common knowledge pre-1968, and that ATC could not be held liable for any post-1968 conduct.  (*See, e.g.*, 11/28/12 Tr. 1495 ("One of the things you are going to have to decide at the end is what was common knowledge about smoking, at various times.  So, some statements after 1968 may come in just on that subject, just to help you figure out what was or was not common knowledge post-1968 . . . and you cannot find [ATC] liable for anything it did after September 11th, 1968."); 11/29/12 Tr. 1615 ("Again . . . that's well past September 11, 1968, but this evidence is coming in on the subject of what was or was not common knowledge."); 12/10/12 Tr. 3058 (post-1968 evidence was "admitted only for a limited purpose[:]  [f]or whatever light it may shed on whether the health hazards and addictiveness of smoking cigarettes were common knowledge before September 11, 1968").)  Moreover, the jury instructions were clear that the claims against ATC were limited to pre-1968 conduct.  (12/10/12 Tr. 3058 ("Plaintiff's claims against [ATC] are limited to conduct . . . occurring on or before September 11, 1968 . . . [and] you may not find [ATC] liable based on anything [ATC] did or did not do, or said or did not say after September 11, 1968.").)  These instructions sufficed to ensure that any potential prejudice did not substantially outweigh the probative value of the evidence.

---

[5] For example, I admitted statements by tobacco company executives, well after 1968, to the effect that it was still not clear whether cigarettes caused cancer or whether nicotine was addictive.  These statements were properly considered by the jury on the issue of whether or not those issues were settled in the public mind before 1968.

*See* Fed. R. Evid. 403.  Further, the evidence at issue was a tiny fraction of the total proof;

ATC's argument that it became the "dog" of the trial rather than the "tail," (*see* D's 50/59 Mem.

11, 13), is a major exaggeration.

For the reasons stated above and on the record at the pre-trial conferences and because it

is presumed that the jury follows its instructions, *see Zafiro v. United States*, 506 U.S. 534, 540

("[J]uries are presumed to follow their instructions.") (internal quotation marks omitted); *United*

*States v. Caronia*, 703 F.3d 149, 174 (2d Cir. 2012) ("We presume that juries follow their

instructions."), there was no error in the admission of limited post-1968 evidence accompanied

by limiting instructions.  ATC's Motion for judgment as a matter of law or a new trial on this

basis is denied.

2.  Internal Documents from Non-Defendant Tobacco Companies

ATC also argues that the Court erred in admitting internal documents created by other

tobacco companies.  (D's 50/59 Mem. 14.)  ATC contends that, given that Dr. K. Michael

Cummings, Plaintiff's expert on tobacco company documents, admitted on cross examination

that he had no evidence that the other companies' documents were ever shared with ATC, (*see,*

*e.g.*, 11/29/12 Tr. 1653-54, 1657-65), the admission of these documents allowed the jury to

impose liability on ATC for the actions of its competitors, (D's 50/59 Mem. 14-16).  Plaintiff

responds that she established that the tobacco companies – including ATC – formed

organizations that consulted with each other on issues of smoking and health, (*see, e.g.*, 11/28/12

Tr. 1423-36, 1439-43, 1448-51, 1455-59, 1461-67, 1469-70), and that the non-ATC documents

admitted were from companies that were members of industry groups along with ATC, (*see, e.g.*,

*id.* at 1516-18, 1521, 1526-28, 1531-32).

ATC's October 22, 2012 letter, (Doc. 384 Ex. A), sought to exclude all internal documents from other tobacco entities before trial.  I denied ATC's motion, stating that the documents were admissible on a notice theory – that is, what was known by one tobacco company was presumably shared with others in an industry trade group – because there was evidence that ATC was sharing information with other tobacco companies.  (*See* 10/31/12 Tr. 181-87.)  As with the post-1968 evidence, I gave the jury limiting instructions that non-ATC documents were only to be used to assess whether the information therein was also known to ATC because of its industry associations.  (*See, e.g.*, 11/28/12 Tr. 1518 ("So, ladies and gentlemen, this is not a statement of [ATC].  It's admitted for your consideration as to whether the information in it was known to [ATC] because of its participation in the same industry as the maker of this statement."); *id.* at 1521-22 ("[W]hat I said a moment ago applies to all of these documents that are from other tobacco companies.").)  Moreover, the Second Circuit has upheld the admission of similar industry documents.  *See Caruolo v. John Crane, Inc.*, 226 F.3d 46, 55 (2d Cir. 2000) (no error to admit documents relating to other manufacturers' knowledge of asbestos risk, which "plaintiff[] w[as] permitted to argue that [defendant], as an industry member, should have known to exist"); *George v. Celotex Corp.*, 914 F.2d 26, 29 (2d Cir. 1990) (no error for trial judge to admit unpublished report of asbestos industry group never seen by defendant because it was relevant to defendant's actual or constructive knowledge).

For the reasons stated above and on the record at the pre-trial conference, and because it is presumed that the jury follows its instructions, *see Zafiro*, 506 U.S. at 540; *Caronia*, 703 F.3d at 174, there was no error in the admission, accompanied by limiting instructions, of internal documents from tobacco companies other than ATC.  ATC's Motion for judgment as a matter of law or a new trial on this basis is denied.

### B.  Jury Instructions

Jury instructions are erroneous if they "mislead[] the jury as to the correct legal standard or . . . fail[] to adequately inform the jury on the law." *Cobb v. Pozzi*, 363 F.3d 89, 112 (2d Cir. 2004).  "To justify a new trial, a jury instruction must be both erroneous and prejudicial." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 163 (2d Cir. 2011).  "An erroneous jury instruction is prejudicial unless the court is convinced that the error did not influence the jury's verdict." *Id.* (internal quotation marks omitted).  On the other hand, "a jury instruction will be deemed adequate if the charge . . . is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012).

### 1.  Duty Instruction

"New York recognizes two exceptions to a failure to warn claim:  (1) where the injured party was fully aware of the hazard through general knowledge, observation or common sense, *i.e.*, he was a knowledgeable user, and (2) where the risks are open and obvious." *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 486 (S.D.N.Y. 2004) (internal quotation marks and citations omitted).  ATC argues that the Court erred in its instructions to the jury on both of these exceptions.[6]  First, ATC alleges that it was error not to instruct the jury that no duty to warn exists where a danger is open and obvious, and by omitting such an instruction, the Court inappropriately took this issue away from the jury's consideration.  (D's 50/59 Mem. 4-5.)

---

[6] The duty to warn instruction given to the jury stated:

> A manufacturer of a product has a duty to warn users against latent dangers resulting from foreseeable uses of its product of which the manufacturer knew or should have known.  A manufacturer has no duty to warn a person of a hazard if the person is already aware of it or reasonably should have been aware of it.  Whether a person reasonably should have been aware must be determined according to the age, experience and development of the person.

(12/10/12 Tr. 3063.)

Second, ATC contends that the Court's knowledgeable user instruction was in error because it did not specify how Champagne could have been aware of the risks of smoking, *i.e.* through "general knowledge, observation, or common sense."  (*Id.* at 5.)  ATC argues that omitting this instruction prevented the jury from assessing if Champagne objectively should have been aware of the risks of smoking, and the instruction given only allowed the jury to consider Champagne's subjective awareness of the risks.  (*Id.* at 6.)

Although the question of whether a risk is open and obvious is most often a jury question, *see Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 541 (S.D.N.Y. 2003), it may be decided as a matter of law "[w]here only one conclusion can be drawn from the established facts," *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 242 (1998).  Here, the facts did not support instructing the jury on the open and obvious exception because the health risks of smoking are latent, and the evidence was plain that those latent risks of smoking cigarettes were not obvious pre-September 11, 1968.  (*See* Section III.C.1, *infra*.)  The open and obvious exception is inapplicable where the hazard is concealed or not apparent to the user.  *See Liriano*, 92 N.Y.2d at 241-42 ("[W]hen a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning.  On the other hand, the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user."); *see also Burke v. Spartanics, Ltd.*, 252 F.3d 131, 138 (2d Cir. 2001) ("Whether a given risk is 'obvious' depends in large part on what the mass of users knows and understands."); *Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir 1991) ("This inquiry into the obviousness of the danger depends not upon actual knowledge of the user, but upon whether the danger was sufficiently obvious that it would be unreasonable to impose a duty to warn on the manufacturer. . . . The danger must be so apparent

or so clearly within common knowledge that a user would appreciate the danger to the same extent that a warning would provide.") (internal citation omitted), *vacated and remanded on other grounds sub nom. N.Y. State Dep't of Health v. Andrulonis*, 502 U.S. 801 (1991), *and reinstated sub nom. Andrulonis v. United States*, 952 F.2d 652 (2d Cir. 1991).

The cases ATC cites in support of its argument that it was error not to include an open and obvious instruction all concern – with one exception – the risks of operating dangerous machinery, *see, e.g.*, *Burke*, 252 F.3d at 134-35 (metal shearing machine); *Rogers v. Westfalia Associated Techs., Inc.*, 485 F. Supp. 2d 121, 124 (N.D.N.Y. 2007) (conveyor system); *Liriano*, 92 N.Y.2d at 236 (meat grinder), or well-known, apparent dangers, *see, e.g.*, *Smith v. Stark*, 67 N.Y.2d 693, 694 (1986) (diving in shallow end of swimming pool); *Payne v. Quality Nozzle Co.*, 643 N.Y.S.2d 623, 624 (App. Div. 2d Dep't 1996) (lighting a match near gasoline-soaked clothing). These cases are factually inapposite. Unlike the open and obvious risks presented by meat grinders or the flammability of gasoline, for example, that inhaling cigarette smoke can cause cancer is not ascertainable simply through common sense, *see Pigliavento v. Tyler Equip. Corp.*, 669 N.Y.S.2d 747, 749 (App. Div. 3d Dep't 1998), or otherwise "reasonably apparent to the user," *Liriano*, 92 N.Y.2d at 242, and thus instructing the jury on the open and obvious exception to duty was not warranted.

ATC cites one case in which a district court in this Circuit found that there was no issue of material fact regarding whether the risks of smoking were common knowledge by 1938 when the plaintiff there began smoking. *See Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 89 (N.D.N.Y. 2000). First, *Tompkins* seems to conflate the open and obvious exception to duty with the knowledgeable user exception,[7] addressing only whether the risks of smoking were

---

[7] ATC also seems to conflate these two exceptions. (D's 50/59 Mem. 6 ("By failing to instruct the jury, however, that it was permitted to consider whether this evidence made the risks of smoking 'open and obvious' to all

commonly known, not whether they were open and obvious.  *See id.* at 86, 89 ("Yet there is no duty to warn consumers of 'obvious risks and dangers,' which is defined to mean 'those risks and dangers which could have been or should have been appreciated by the user or that can be recognized as a matter of common sense'" and finding that there was no issue of material fact regarding defendant's duty to warn because "the risks of smoking were common knowledge in 1938") (quoting *Pigliavento*, 669 N.Y.S.2d at 749).  Further, *Tompkins*'s holding that there was no genuine issue of material fact regarding whether the risks of smoking were common knowledge is unpersuasive in light of the evidence presented at trial here.  (*See* Section III.C.1, *infra*.)  This evidence was not before the court in *Tompkins*, where the plaintiff "refute[d] none" of the defendant's evidence on common knowledge.  *See id.* at 89.  The evidence here showed that the health hazards and addictiveness of smoking were hotly debated issues in the 1960s, and thus not something all users necessarily should have appreciated.  Indeed, the evidence was clear that vast numbers of individuals did not appreciate the dangers of smoking.  And, in any event, even if the latent risks of inhaling cigarette smoke were common knowledge in 1968 – which the record did not support – that would hardly make those risks open and obvious in the way a machine with sharp edges or a shallow pool is.  Indeed, ATC introduced no evidence suggesting that before 1968 everyone understood through simple common sense that smoking caused cancer or otherwise appreciated the latent risk of smoking.  The situation is thus unlike the open-and-obvious-danger cases, where it can easily be inferred that anyone with normal powers of observation can perceive the danger (for example, of a shallow pool or a sharp blade).  Rather,

---

individuals in Mr. Champagne's situation through 'general knowledge, observation, or common sense,' the Court severely prejudiced ATC.").)  New York law is clear, however, that the open and obvious and knowledgeable user exceptions to a manufacturer's duty to warn are two distinct exceptions.  *See, e.g.*, *Burke*, 252 F. 3d at 139; *Hollman v. Taser Int'l Inc.*, No. 06-CV-3588, 2013 WL 864538, at *12 (E.D.N.Y. Mar. 8, 2013); *Adeyinka v. Yankee Fiber Control, Inc.*, 564 F. Supp. 2d 265, 280 (S.D.N.Y. 2008); *Stewart v. Honeywell Int'l Inc.*, 884 N.Y.S.2d 743, 744 (App. Div. 1st Dep't 2009).

smoking causes cancer through a biological process not apparent to a lay person through simple

observation or common sense.  Accordingly, there was no error in omitting a jury instruction on

the open and obvious exception to duty.

Regarding the knowledgeable user instruction, for the reasons stated on the record at the

charge conference, I considered the "general knowledge, observation, or common sense"

language to be superfluous.  (12/4/12 Tr. 2476-78, at 2478 ("I don't think it adds anything.  If the

person is aware of it through any means, then the manufacturer has no duty to warn, it seems to

me.").)  Although ATC argues that without this language the jury could not consider whether

Champagne objectively should have been aware of the risks of smoking before 1968 – only

whether he was subjectively aware – the knowledgeable user exception contemplates a

subjective inquiry.  *See Leibstein v. LaFarge N. Am. Inc.*, 689 F. Supp. 2d 373, 388-89

(E.D.N.Y. 2010) ("The [knowledgeable user] exception involves a subjective test that focuses on

the user's actual knowledge.  General knowledge that the product is dangerous does not suffice;

to fall under the exception, the user must have known about the 'specific hazard' that caused the

injury.") (internal quotation marks and citations omitted); *Pelman*, 237 F. Supp. 2d at 540 n.31

("Pursuant to the 'knowledgeable user' defense, proximate cause cannot be found where the

plaintiff is a knowledgeable user who is actually aware of the dangerous nature of the product

supplied.  The 'knowledgeable user' defense thus employs a subjective standard, while the 'open

and obvious' defense employs an objective standard.") (internal citations omitted); *Liriano*, 92

N.Y.2d at 241 ("Thus, where the injured party was fully aware of the hazard through general

knowledge, observation or common sense . . . lack of a warning about that danger may well

obviate the failure to warn as a legal cause of an injury resulting from that danger.  Thus, in

appropriate cases, courts could as a matter of law decide that a manufacturer's warning would

have been superfluous given an injured party's actual knowledge of the specific hazard that

caused the injury.  Nevertheless, in cases where reasonable minds might disagree as to the extent

of plaintiff's knowledge of the hazard, the question is one for the jury.") (internal citations

omitted); *Smith*, 67 N.Y.2d at 694 (no liability where "plaintiff must have known that, if he dove

into the pool, the area into which he dove contained shallow water").  Even if the standard is

objective, *see Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, at *15

(N.D.N.Y. Sept. 28, 2000) (finding that New York cases were not explicit on whether the

knowledgeable user standard was subjective or objective and analyzing what was generally

known by the public at time plaintiffs smoked cigarettes); *Tompkins*, 92 F. Supp. 2d at 86-87

(same), the jury was properly instructed that ATC had no duty to warn if Champagne was aware

of the risks of smoking or reasonably should have been.[8]  It thus could not have found for

Plaintiff if it believed that Champagne objectively should have been aware of the risks of

smoking.[9]  For the reasons stated above, it was not error to omit the phrase "general knowledge,

observation, or common sense" from the instruction on the knowledgeable user exception to

duty, and ATC's Motion for judgment as a matter of law or a new trial on these bases is

accordingly denied.

## 2.  Causation Instruction

ATC asserts that it was error to omit its proposed explanation of the term "substantial

factor" in the causation instruction.[10]  (D's 50/59 Mem. 6-7.)  ATC proposed that the instructions

---

[8] ATC was of course free to argue that Champagne did in fact know the hazards of smoking – through general knowledge, observation, common sense, or some other means.

[9] The state of common knowledge could be relevant to that inquiry, so for that reason I allowed ATC to introduce evidence of media and other public pronouncements on the dangers of smoking.

[10] The causation instruction given to the jury stated:

> An act or omission is a proximate cause of an injury if it was a substantial factor
> in bringing about that injury.  That is, if it had such an effect in producing the

include a sentence defining "substantial factor" as so-called "but for" causation – that "the injured party would not have sustained the injuries absent the Defendant's conduct, and that there be some direct relation between the injury asserted and the injurious conduct alleged."  (*Id.* at 7; Doc. 332 Ex. 1, at 22.)  ATC argues that omitting this definition improperly removed from the jury's consideration whether Champagne would have still been injured absent ATC's conduct.  (D's 50/59 Mem. 7.)

For the reasons stated on the record at the charge conference, it was not error to omit ATC's proposed "but for" causation instruction.  (*See* 12/4/12 Tr. 2490-95.)  First, in a trial with two defendants and alleged concurrent causes,[11] instructing the jury on "but for" causation could have resulted in confusion, resulting in the possible finding that neither of two substantial causes would be the "but for" cause.  (*Id.* at 2491-92 (where two defendants push plaintiff down steps

---

> injury that reasonable people would regard it as a cause of the injury.  Plaintiff must prove by a preponderance of the evidence that defendant [ATC's] failure to warn William Champagne of the health hazards and/or addictiveness of smoking was a substantial factor in causing William Champagne's injury.  There may be more than one cause of an injury.  Many factors or things or the conduct or two or more persons or entities may operate at the same time, either independently or together to cause an injury, and in such case each may be a proximate cause.  So there may be more than one proximate cause, but to be substantial, it cannot be slight or trivial.  You may, however, decide that a cause is substantial even if you assign a relatively small percentage to it.  If you find by a preponderance of the evidence that the defendant [ATC's] conduct was not a substantial factor in causing William Champagne's injuries, this element is not met.  But if you find that defendant [ATC's] conduct was a substantial factor in causing William Champagne's injuries, this element is met and the fact that there may have been other causes is irrelevant and will not reduce or eliminate defendant [ATC's] liability.

(12/10/12 Tr. 3065-66.)

ATC explicitly waived any defense of comparative fault to failure to warn, (6/25/12 Tr. 88), so no instruction on that subject was given.  But over Plaintiff's objection, (*see id.* at 57-92), I permitted ATC to introduce evidence of other possible causes of Champagne's injuries – such as his own failure to quit smoking – in support of its argument (rejected by the jury) that other causes were so substantially causative that ATC's conduct was not a substantial factor in Champagne's injuries.

[11] Philip Morris was also a defendant because Plaintiff switched to Philip Morris's Marlboro Reds and Lights after smoking ATC's Lucky Strikes for approximately fourteen years.  The jury rejected Plaintiff's claim against Philip Morris for fraud in the marketing of Marlboro Lights, finding intentional misstatements of material fact but not that Champagne actually relied on these misrepresentations.

simultaneously, "[defendants] would both be acquitted because assuming each . . . was strong enough to push [plaintiff] down the stairs, [plaintiff] would have sustained the injury without the other [defendant]").)[12]  Second, it is hard to distinguish substantial factor and "but for" causation in the circumstances of this case.  (*Id.* at 2492 ("I don't think there's any chance that the jury could find either defendant liable if it did not regard either defendant []as a but for cause in the sense that it must find that the defendant was a substantial factor in bringing about the injury.").)  Finally, the cases ATC cited in support of its proposed charge – the same cases it cites in the instant Motion – were not persuasive.  (*See id.* at 2493-95.)

For example, in *Caronia v. Philip Morris USA, Inc.*, No. 06-CV-224, 2011 WL 338425 (E.D.N.Y. Jan. 13, 2011), *affirming in part and certifying questions*, No. 11-CV-0316, 2013 WL 1810843 (2d Cir. May 1, 2013),[13] the district court noted that New York law "uses 'substantial factor' to refer to the subset of but for causes that will be said to be the proximate or legal cause of an actionable harm."  *Id.* at *11.  There, the court analyzed a hypothetical medical monitoring cause of action, holding that relief was unavailable because plaintiffs had not adequately pleaded that Philip Morris's failure to produce a non-defective cigarette was the reason plaintiffs required medical monitoring.  *See id.* at *11-12.  *Caronia* did not address a factual scenario akin to Champagne's injury.  Moreover, the language ATC cites is part of the court's analysis of the elements of a hypothetical cause of action, which does not persuade me that it is appropriate to give an instruction on "but for" causation to a jury analyzing an entirely different claim,

---

[12] The New York Pattern Jury Instructions also recognize that the "but for" rule is potentially problematic where a tort has concurrent causes.  New York Pattern Jury Instructions, Civil § 2:70, at 373 (3d ed. 2008) ("The 'but for' rule is, however, inconsistent with accepted substantive rules of tort law.  Thus, it is elementary that when either act of negligence of two independent wrongdoers may be found to be a direct cause of injury, either wrongdoer is, or both wrongdoers are, responsible for the whole injury, yet neither would be held under the 'but for' rule since the injury would have occurred in any event through the negligence of the other.") (internal citations omitted).

[13] The Second Circuit recently certified several questions to the New York Court of Appeals, including whether New York recognizes an independent cause of action for medical monitoring, its elements, and the applicable statute of limitations.  *Caronia*, 2013 WL 1810843, at *32-33.

particularly given that the jury here was instructed that ATC's failure to warn must be a

"substantial factor in causing William Champagne's injury" – and thus, also a "but-for" cause.

(12/10/12 Tr. 3066.)  Likewise, *Gonzalez v. Delta Int'l Mach. Corp.*, 763 N.Y.S.2d 844 (App.

Div. 2d Dep't 2003), and *Ramirez v. Sears, Roebuck & Co.*, 729 N.Y.S.2d 503 (App. Div. 2d

Dep't 2003), are unavailing.  In both cases, the Second Department held that the plaintiff failed

to prove that his injury was sustained in whole or in part because of the defendant's negligence

and, thus, there was no proximate cause.  *See Gonzalez*, 763 N.Y.S.2d at 846; *Ramirez*, 729

N.Y.S.2d at 505-06.  Far from indicating that the jury should have been instructed on "but for"

causation, both cases instead acknowledge that proximate cause exists where a plaintiff's injury

is sustained at least in part by a defendant's negligence, which is consistent with the substantial

factor instruction given to the jury here.

Finally, the causation instruction is an accurate statement of proximate cause under New

York law.  *See Frankson v. Philip Morris Inc.*, 791 N.Y.S.2d 869, at *2 (Sup. Ct. Kings Cnty.

2004) (unpublished table decision) ("[A]ll a plaintiff need show is that the defendant's conduct

was a substantial factor in bringing about the injury.  This showing need not eliminate every

other factor that may have contributed to the cause of the injury.") (internal citation omitted),

*aff'd* 818 N.Y.S.2d 772 (App. Div. 2d Dep't 2006); N.Y. Pattern Jury Instructions, Civil §§ 2:70-

71, at 371, 379 (3d ed. 2008) ("An act or omission is regarded as a cause of an injury if it was a

substantial factor in bringing about the injury, that is, if it had such an effect in producing the

injury that reasonable people would regard it as a cause of the injury. . . . There may be more

than one cause of an injury.  Where the independent and negligent acts or omissions of two or

more parties cause injury to another, each of those . . . is regarded as a cause of that injury

provided that it was a substantial factor in bringing about that injury."); *cf. Caronia,* 2013 WL

1810843, at *9 ("In order to establish a *prima facie* case in strict products liability for design defects, the plaintiff must show that . . . the defective design was a substantial factor in causing plaintiff's injury.") (internal quotation marks omitted); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 110 (1983) ("[T]he plaintiff must show that the design defect in the product was a substantial factor in causing his injury.").  Further, "under New York law, plaintiff[] need not prove . . . that the defendant's conduct was the sole cause of the injuries.  Rather, the common law of torts . . . instructs that the existence of additional factors causing an injury does not necessarily negate the fact that the defendant's wrong is also the legal cause of the injury.  In assessing whether one cause among many constitutes proximate cause, courts have engaged in inquiries such as whether a cause is a substantial factor in bringing about the harm, or whether the cause is too remotely or insignificantly related to the harm to be a legal basis for liability." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, No. 12-CV-1543, 2013 WL 709655, at *1 (2d Cir. Feb. 28, 2013) (summary order) (alteration, citation, and internal quotation marks omitted); *see Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) ("A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury.").  For the reasons stated above, it was not error to omit ATC's proposed causation instruction, and ATC's Motion for judgment as a matter of law or a new trial on this basis is denied.

    3.  First Amendment and *Noerr-Pennington* Doctrine

    ATC requested that the Court instruct the jury on its First Amendment rights and the *Noerr-Pennington* doctrine.  (*See* Doc. 332 Ex. 1, at 58-59.)  Specifically, ATC requested that the following two instructions be included in the jury charge:

- "Statements made by either defendant as part of the public debate concerning the health consequences or addictiveness of cigarettes are protected speech under the First Amendment to the United States Constitution, and cannot form the basis for liability with respect to any of Plaintiff's claims against either defendant." (*Id.* at 58.)

- "A defendant cannot be held liable for attempting to influence government action. No liability can be based on mere attempts to influence the passage or enforcement of laws." (*Id.* at 59.)

ATC argues that the failure to give these instructions was highly prejudicial because Plaintiff elicited testimony about ATC's opposition to cigarette labeling requirements, ATC's relationship with the lobbying efforts of the American Medical Association ("AMA") against warning labels, and tobacco executives' participation in 1994 Congressional hearings, (*see* D's 50/59 Mem. 8-10), and the jury likely found ATC liable for engaging in these constitutionally protected activities, (D's 50/59 Reply 11).[14]  Plaintiff asserts that these activities were not the basis for ATC's liability on the failure to warn claim, and any testimony about ATC's position on cigarette warning labels was relevant only to show that ATC breached its duty to warn Plaintiff – not an independent reason for imposing liability.  (*See* P's 50/59 Opp. 28-29.)  For the following reasons, I agree with Plaintiff that there was no error in omitting the requested instructions.

It is undisputed that cigarette manufacturers have constitutionally protected First Amendment rights, *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 564-65, 571 (2001), and

---

[14] "D's 50/59 Reply" refers to Reply Brief in Support of Defendant's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50 of the Federal Rules of Civil Procedure and Motion for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure.  (Doc. 402.)

the *Noerr-Pennington* doctrine "protects under the First Amendment efforts to influence governmental action through litigation, lobbying, and the like," *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135, at *1 (2d Cir. 2000) (summary order) (unpublished table decision).  "Such activities are immunized from antitrust liability, provided the activities are more than a mere 'sham,'" *id.*, and the Second Circuit has occasionally applied the doctrine outside of the antitrust context "to provide immunity from liability for bringing other suits," *see e.g.*, *Hirschfeld v. Spanakos*, 104 F.3d 16, 19 (2d Cir. 1997) (42 U.S.C. § 1983); *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 99 (2d Cir. 1983) (state law antitrust and tortious inference).  One court in this district has held that the *Noerr-Pennington* doctrine barred a plaintiff's fraud claim based on Philip Morris's allegedly false and misleading statements to Congress, *see Tuosto v. Philip Morris USA Inc.*, No. 05-CV-9384, 2007 WL 2398507, at *4-6 (S.D.N.Y. Aug. 21, 2007), but Plaintiff's failure to warn claim against ATC was not based in any sense on ATC's lobbying or petitioning activity, but rather upon its alleged failure to inform Champagne of the health hazards and addictiveness of smoking its cigarettes.

ATC alleges only three instances during the lengthy trial where Plaintiff elicited testimony about ATC's protected activity, and none merited including an instruction to the jury on the First Amendment or *Noerr-Pennington*.  First, Dr. Cummings testified about the process culminating in legislation requiring warning labels on cigarette packs in 1966, noting that ATC "testified before . . . Congress that was debating this issue, that they opposed warnings" because "it hadn't been proven that smoking caused disease."  (11/28/12 Tr. 1490.)  Dr. Cummings's testimony mentioning statements made to Congress was relevant to the duty and breach analysis of Plaintiff's failure to warn claim:  first, to assess whether the health hazards and addictiveness of smoking cigarettes were common knowledge pre-1968, and second, to examine the adequacy

of the warning that did appear on the packs during the relevant time period.  These statements by the tobacco industry to Congress were clearly not an independent reason to impose liability for failure to warn claim, unlike *Tuosto*, where the tobacco industry's Congressional testimony was the false representation that formed the basis for the plaintiff's fraud claim.

Similarly, Plaintiff's counsel cross-examined Dr. Schaller about his awareness of the AMA's lobbying efforts with respect to the cigarette warning labels – as to which Dr. Schaller disclaimed any knowledge.  (*See* 12/4/12 Tr. 2455-56.)  These questions (not evidence) about a non-party's lobbying efforts do not implicate any protected First Amendment activity by ATC.[15]

Finally, Dr. Cummings stated that tobacco executives gave sworn statements to Congress in 1994 regarding the addictiveness of nicotine, and the jury saw a video of the testimony that revealed neither the executives' names nor affiliations.  (11/29/12 Tr. 1614-15.)  The clip contained only a single question posed by a Congressman – "Yes or no, do you believe nicotine is not addictive?" – and the corresponding answers from only two of the executives present.  (*See* 11/28/12 Tr. 1397-1401.)  Unlike *Tuosto*, where the testimony from the 1994 hearings formed the basis of the plaintiff's fraudulent misrepresentation claim, neither ATC nor its successor Brown & Williamson were mentioned during the testimony, and the jury was instructed that the evidence was admitted only on the issue of what was or was not common knowledge pre-1968.  (11/19/12 Tr. 1615.)

---

[15] Plaintiff's counsel also asked Dr. Schaller, "So you don't know about [ATC] or any other tobacco company giving money to the AMA in the 1960s, just to be clear."  (12/4/12 Tr. 2456.)  ATC's counsel immediately objected, and Dr. Schaller never answered the question.  While the question does suggest that ATC funded the AMA's lobbying efforts against warning labels, counsel's questions are not evidence, and the jury was instructed throughout the trial – including immediately following ATC's objection to this question, (*id.* ("The jury knows that lawyer's questions aren't evidence.")) – that a lawyer's statements could not be considered as evidence, (*see, e.g.*, 11/14/12 Tr. 36-37; 12/10/12 Tr. 3086).  Likewise, ATC's argument in reply about Plaintiff's counsel's statements in closing arguments, (D's 50/59 Reply 11), is unavailing as the jury was clearly instructed that summations are not evidence, (12/10/12 Tr. 3086), and it is presumed that the jury follows its instructions, *see Zafiro*, 506 U.S. at 540; *Caronia*, 703 F.3d at 174.

It is simply inconceivable that the jury regarded any of these statements as a basis of liability for failure to warn.  It was thus not error to omit ATC's proposals on the First Amendment and *Noerr-Pennington*, and ATC's Motion for judgment as a matter of law or a new trial on this basis is denied.

### C.  Plaintiff's Negligent Failure to Warn Claim

#### 1.  Duty To Warn

ATC argues that Plaintiff failed to prove that ATC had a duty to warn, and the jury's finding that ATC did have such a duty is against the weight of the evidence and warrants judgment as a matter of law or a new trial.  (D's 50/59 Mem. 16-17.)  Specifically, ATC argues that the evidence at trial demonstrated that Champagne knew or reasonably should have known about the health hazards and addictiveness of smoking, thus obviating ATC's duty to warn him of these risks.  (*See id.* at 17-20.)  For example, it is undisputed that Plaintiff's experts, Dr. Cummings and Dr. Grunberg, and ATC's expert, Dr. Schaller, all testified that information about the health risks of smoking were published in magazines and newspapers and on television before Champagne began smoking and continued to be disseminated through September 11, 1968.  (D's 50/59 Mem. 17-19; D's 50/59 Reply 3.)  Plaintiff also presented evidence that Champagne was not aware of the health hazards and addictiveness of smoking cigarettes – specifically, that Champagne first learned about the link between smoking and lung cancer in approximately 1985 when his good friend, Stretch Valente, was diagnosed with lung cancer that his doctor attributed to smoking cigarettes.[16]  (11/15/12 Tr. 235-37, 244, 328-29.)

---

[16] Even if, as ATC contends, Champagne learned of the link between smoking and cancer in 1980 when his uncle, Steven Tatko, died of throat cancer, (D's 50/59 Mem. 20), the evidence still establishes that Champagne was not aware of the health hazards of smoking before September 11, 1968.  Moreover, the testimony on this point was disputed at trial, with Plaintiff alleging that neither she, Champagne, nor Tatko's wife associated Tatko's cancer with smoking.  (11/15/12 Tr. 240-42.)

On this record, the jury reasonably found that Champagne was neither aware, nor reasonably should have been aware, of the hazards of smoking in 1968 and earlier.  Plaintiff introduced abundant evidence that there were mixed messages about the health hazards of smoking prior to September 11, 1968, and that much of the public was similarly uninformed about the risks.  For example, Champagne's friends and family testified that they were unaware of the health hazards of smoking before 1968.  Plaintiff also learned that smoking caused lung cancer after Valente's diagnosis in approximately 1985, before which neither she nor Champagne associated anyone's death with a smoking-related disease.  (*Id.* at 237, 239.) Plaintiff stated that the warnings about the risks of smoking before 1985 were "very vague and . . . general;" she considered smoking to be only one of many things that could be dangerous to one's health; and the material about the risks of smoking "didn't seem to be conclusive."  (*Id.* at 237-38.)  Further, Kevin Panichi, Champagne's childhood friend, did not understand that smoking could cause cancer while he was in high school, and likely only made the connection after college.  (Panichi Dep. 28-29, 93-95.)[17]  Panichi was also surprised to learn that the Surgeon General's report linking lung cancer and smoking was released in 1964, and did not recall it being "big news" at the time.  (*Id.* at 93-94.)  Plaintiff's expert, Dr. Cummings, opined that that "[t]he public was ill informed about the risks of smoking" in the 1950s.  (11/28/12 Tr. 1439.)  Dr. Cummings stated that while many people were aware that studies relating to smoking and health had been conducted, mainstream media coverage also included responses to the results from tobacco companies or industry groups like the Tobacco Industry Research Committee ("TIRC"), which generally stated that there was no proof that smoking caused cancer and that more research was necessary.  (*Id.* at 1439-40.)  Dr. Cummings also cited late 1950s

---

[17] "Panichi Dep." refers to selections from the July 13, 2006 Deposition of Kevin Panichi.  (Doc. 387 Ex. A.)

polling data revealing that more than half of physicians were smokers during that time, and only

14% of the physicians surveyed – the majority of whom were nonsmokers – believed that the

link between smoking and lung cancer had been consistently proven.  (11/29/12 Tr. 1587-88.)

It is undisputed that magazines, newspapers, and television ran stories about the health

risks of smoking before 1968.  (*See* D's 50/59 Mem. 17-19.)  Plaintiff established, however, that

even though *Reader's Digest* published thirty-six stories on smoking and health between 1922

and 1964, the magazine published approximately 12,600 total articles during the same time

period.  (12/4/12 Tr. 2387-88.)  Cigarette advertising was also prevalent, and before 1968, the

U.S. government did not require – and ATC did not include – warnings on tobacco

advertisements.  (11/28/12 Tr. 1489, 1536-37.)  A U.S. government report in January 1967

evaluated the efficacy of the warning labels that went on cigarette packs in 1966 and concluded,

"[T]he present warning has not been a significant deterrent to cigarette smoking.  Also, the

warning on the package does not have any impact on the many children and young people who

are daily exposed to cigarette advertising."  (*Id.* at 1502-03.)

Further, Dr. Cummings explained – and ATC did not refute – that cigarette advertising in

the 1950s was "everywhere," and in the 1960s, cigarettes and automobiles were the two main

products advertised.  (*Id.* at 1533-34.)  Tobacco companies sponsored television programs and

sporting events, including football games and the Olympics, and ATC was likely the biggest

advertiser among all of the tobacco companies because it manufactured the two leading cigarette

brands at the time – Lucky Strike and Pall Mall.  (*Id.* at 1534-37.)  ATC's expert, Dr. Schaller,

agreed that from 1950 to 1968, cigarette advertising portrayed "healthy looking people enjoying

life and did not contain any warning about the risks of cigarette smoking," and that the number

of television advertisements greatly exceeded the number of televised reports about the risks of

smoking.  (12/4/12 Tr. 2384.)  Dr. Schaller agreed that the number of cigarette advertisements in

*The New York Times*, *New York Daily News*, *New York Post*, *Life*, *Time*, *Newsweek*, *Albany*

*Times Union*, and *Troy Record* likely exceeded the number of published reports on the risks of

smoking during the same time period.  (*Id.* at 2384-85.)  Cigarette advertisements were also

featured in periodicals that published articles about the health hazards of smoking; for example,

the June 1953 issue of *Life* containing the results of Dr. Wynder's and Dr. Graham's mouse-

painting study also had three full-page ads for cigarettes.  (11/28/12 Tr. 1419-20.)

      Plaintiff also presented evidence of ATC's contemporaneous statements about smoking

and health.  In November 1953, ATC was the first tobacco company to deny publicly the

allegations that smoking caused cancer, stating in a press release that the link "has not been so

proved."  (*Id.* at 1421-22.)  ATC and other companies then issued the "Frank Statement to

Cigarette Smokers," circulated to approximately forty million people in January 1954, that

stated, "We accept an interest in people's health as a basic responsibility, paramount to every

consideration of our business.  We believe the products we make are not injurious to health.  We

always have and always will cooperate closely with those whose task it is to safeguard the public

health."  (*Id.* at 1428-30.)  Between 1954 and 1968, Dr. Cummings testified, the TIRC – a group

formed by tobacco companies, including ATC, ostensibly to fund research into the relationship

between smoking and health – issued statements to the press affirming that cigarettes were not

injurious and that there was no proven link between smoking and disease.  (*Id.* at 1431-34.)  The

TIRC later changed its name to Council for Tobacco Research ("CTR") in March 1964, and

neither the TIRC nor the CTR ever admitted that cigarette smoking caused cancer.  (*Id.* at 1433-

34.)  Following the 1964 Surgeon General's Report concluding that cigarette smoking caused

lung cancer, CTR and the Tobacco Institute (an industry group to which ATC belonged until

1966), continued to state that the link had not been proven and more research was needed, (*id.* at 1461, 1475-77, 1483-85, 1505), and ATC's president stated in 1965 that the company wanted its investors, friends, and the smoking public to know its stance on smoking and health: that there was no proof that cigarettes harmed smokers and further research was unnecessary, (*see id.* at 1485-87).  Finally, in response to a customer's query about the link between smoking and cancer, ATC replied to the customer in writing and stated that, "There is no proof that smoking is a cause of lung cancer or cardiovascular disease."  (*Id.* at 1436-37.)

Plaintiff also presented testimony from Robert Heimann, ATC's former Chief Executive Officer.  Heimann testified that it was ATC's position throughout his tenure at the company – from approximately 1954 until 1980 – that smoking was not injurious to health.  (Heimann Dep. 14, 25-26, 86-87.)[18]  Heimann stated that ATC wanted the public to believe this assertion, and there was no reason "in the area of scientific integrity" why a person should not accept ATC's position on smoking and health.  (*Id.* at 87.)

ATC's Motion for judgment as a matter of law or a new trial is denied.  There is neither "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," *Cweklinsky*, 364 F.3d at 75 (internal quotation marks omitted), nor "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [*sic*] could not arrive at a verdict against the moving party," *Okemo Mountain*, 303 F. App'x at 940 (alteration and internal quotation marks omitted).  ATC presented evidence that information regarding the risks of smoking was publicly available, but Plaintiff introduced sufficient evidence from which a reasonable juror could conclude both that Champagne was unaware of the health hazards and addictiveness of smoking pre-September

---

[18] "Heimann Dep." refers to selections from the December 19, 1986 Deposition of Robert Heimann.  (Doc. 388 Ex A.)

11, 1968 and that in that period the public generally was presented with such conflicting information that it did not appreciate the health risks of smoking.  Indeed, the jury could reasonably conclude that the pro-smoking messages – including ATC's widespread advertising and denials of a link between smoking and health – drowned out the health warnings.  For these reasons, the jury's verdict was also not "seriously erroneous," or a "miscarriage of justice," *Kosmynka*, 462 F.3d at 82 (internal quotation marks omitted), and ATC is thus not entitled to a new trial.

    2.  <u>Proximate Cause</u>

ATC contends that Plaintiff failed to prove that ATC's alleged failure to warn was a substantial factor in Champagne's injury, asserting that Plaintiff cannot prove causation through evidence of Champagne's alleged addiction because it is undisputed that even heavily addicted smokers can quit smoking, and, in fact, Champagne eventually did quit smoking in 2003.  (*See* D's 50/59 Mem. 20-22 & n.8; D's 50-59 Reply 4-5.)  Addiction evidence is relevant to causation, however, because the crux of Plaintiff's argument is that Champagne was unaware of the risks of smoking when he began smoking as a child; he quickly became heavily addicted, making it significantly harder for him to quit and resulting in his continuing to smoke for many years; and ATC's failure to warn Champagne of the health hazards and addictiveness of smoking was thus a substantial factor in his eventual injury.  (P's 50/59 Opp. 20.)

ATC also argues that there was no evidence that additional warnings would have prevented Champagne from starting to smoke or induced him to quit smoking earlier than he did – particularly as he continued to smoke long after learning of the health risks and despite warnings from those closest to him.  (*See* D's 50/59 Mem. 20-22; D's 50-59 Reply 4-5.)  It is undisputed that Plaintiff, as well as Champagne's children, friends, and doctor, all encouraged

him to quit smoking, particularly after Valente's cancer diagnosis, (*see e.g.*, 11/15/12 Tr. 244,

265, 329, 340-41, 375-76), but he continued to smoke until September 2003, (*id.* at 261, 274-75).

But ATC's argument overlooks that by the time Champagne was warned, he was already

hooked, thus making quitting far from the simple proposition that ATC's argument suggests.[19]

Evidence of Champagne's smoking history is relevant to causation, and so I admitted it over

Plaintiff's objection, but it is not, as ATC contends, dispositive.  The jury was instructed to

consider whether other possible causes of Champagne's injury – which would include his

smoking despite knowledge of the dangers – were so substantial as to render any potential failure

to warn by ATC insubstantial, (*see* 12/10/12 Tr. 3066), and it reasonably found that no other

possible causes met that standard.

At trial, Dr. Cummings, who also served as Plaintiff's expert on smoking cessation and

epidemiology, opined that Champagne was heavily addicted to nicotine, likely by age twelve to

fifteen, and that his addiction was a substantial factor in his continued smoking until September

2003.  (*See* 11/29/12 Tr. 1616-21.)  Dr. Cummings based his opinion on accepted set criteria,

including the frequency of Champagne's smoking, the amount of time until he smoked his first

cigarette of the day, the age he began smoking, his efforts to abstain from smoking, length of

abstention and withdrawal symptoms, and his continued smoking after learning of the health

risks.  (*Id.* at 1618-20.)  Panichi testified that Champagne began smoking Lucky Strikes by at

least age twelve and that Champagne probably smoked two to three cigarettes per hour because

Panichi always remembered seeing him with a cigarette in his hand.  (Panichi Dep. 16, 22.)

Panichi further stated that Champagne had his first cigarette shortly after he woke up in the

morning before coffee or breakfast.  (*Id.* at 25-26.)  Jennifer Champagne testified similarly that

---

[19] That Champagne was eventually able to quit with the aid of hypnosis after many failed attempts does not
undermine the conclusion that he continued to smoke after learning of the risks because he was addicted.

her father woke up in the middle of the night to smoke and had his first cigarette every morning around 6 a.m.  (11/16/12 Tr. 441.)  Plaintiff also testified that after Valente's death, Champagne tried to stretch out the time between his cigarettes, but he experienced withdrawal symptoms such as agitation and irritability, and could only go without a cigarette for approximately five hours.  (11/15/12 Tr. 255-57.)

Dr. Grunberg, Plaintiff's addiction expert, explained that repeated exposure to nicotine, unlike most other addictive drugs, causes the brain to develop more nicotine receptors, which increases tolerance, requires more nicotine to achieve the same effect, and strengthens the addiction.  (11/30/12 Tr. 1963-64, 1985.)  Moreover, when abstaining from smoking, cravings and irritability result, requiring more nicotine for satiation.  (*Id.* at 1985.)  According to Dr. Grunberg, some individuals have a more difficult time quitting an addictive drug such as nicotine, and factors evidencing this difficulty include nicotine intake amount, breaking rules to smoke, withdrawal symptoms, length of time between waking up and lighting a cigarette, how the cigarette is smoked (*i.e.*, depth of inhalation, smoking cigarette until filter, and time between cigarettes), and continued smoking even if it endangers health.  (*Id.* at 1998-2000.)  Judith Miazga, who knew Champagne as a teenager, stated that he warned her in approximately 1973 or 1974 not to start smoking because it was tough to quit.  (11/26/12 Tr. 1074, 1086.)  Champagne also told his daughter that she should not ever start smoking because once she started, she would not be able to stop and she would end up like him.  (11/16/12 Tr. 446-47.)  Plaintiff testified that Champagne tried various methods to smoke less or quit entirely, including switching brands, the nicotine patch and gum, and sucking on hard candy, and he eventually quit smoking with the assistance of the patch and hypnosis.  (11/15/12 Tr. 253-54, 266-67, 274-77.)

Finally, Dr. Cummings testified about his work on the 1994 Surgeon General's report on tobacco use in underage smokers.  (*See* 11/29/12 Tr. 1583-85.)  The report's first conclusion was that most first-use of tobacco occurs before high school graduation, and Dr. Cummings stated that ATC knew in the 1950s and 1960s that Lucky Strike was a popular brand among young people.  (*Id.* at 1583-84.)  The report's second conclusion was that most adolescent smokers are addicted to nicotine and cannot quit despite wanting to do so, and Dr. Cummings opined that ATC knew that adolescent smokers were becoming addicted in the 1950s and 1960s.  (*Id.* at 1584-85.)

Plaintiff thus presented evidence from which a reasonable juror could easily conclude that Champagne quickly became addicted when he began smoking at approximately twelve before he understood the health risks and addictiveness of smoking, and thus that ATC's failure to warn Champagne before he became addicted was at least one substantial factor in his injury. *See Inzerilla v. Am. Tobacco Co.*, No. 11754/96, 2000 WL 34016364, at *6 (N.Y. Sup. Ct. Queens Cnty. Oct. 27, 2000) (denying summary judgment because "[i]t may be argued that the decedent's continued use of tobacco products for approximately twenty-eight years after warning labels were first affixed to cigarette packages destroys the contention that the alleged failure to warn proximately caused her injury.  The court rejects this argument because it overlooks the element of addiction . . . . In the case at bar, the decedent allegedly learned of the carcinogenic properties of cigarettes at a time when addiction allegedly prevented her from acting upon that knowledge.  Whether the decedent was actually addicted to cigarettes is itself a question of fact . . . .") (internal citations omitted).  Moreover, proximate cause is a quintessential jury question. *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215-16 (2d Cir. 2002) ("Under New York law . . . decisions as to a lack of reasonable care and its nexus to a plaintiff's injury are

quintessential jury questions . . . .  Thus, 'foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication . . . .'") (quoting *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 611 (1994)).  For the reasons stated above, the jury's verdict that ATC's failure to warn was a substantial factor in Champagne's injury is neither against the weight of the evidence nor erroneous, and ATC's Motion for judgment as a matter of law or a new trial on this basis is denied.

### D.  Plaintiff's Loss of Consortium Claim

ATC argues that it was error to submit Plaintiff's loss of consortium claim to the jury because such a claim would be viable only if Plaintiff had been married to Champagne at the time of ATC's alleged failure to warn, and Plaintiff did not marry Champagne until November 1975 – more than seven years after the claims against ATC ended.  (D's 50/59 Mem. 22-24.)

In *Consorti v. Owens-Corning Fiberglas Corp.*, 86 N.Y.2d 449 (1995), the New York Court of Appeals answered a certified question from the Second Circuit, concluding that a loss of consortium claim could not lie under New York law where the plaintiff's husband was exposed to asbestos prior to marriage, but his illness did not occur until after his marriage, *id.* at 454.  The Court analogized from the statute of limitations for tort claims articulated in *Schmidt v. Merchs. Despatch Transp. Co.*, 270 N.Y. 287 (1936),[20] which fixed the tortious injury as the date when "the toxic substance invades or is introduced into the body," *Consorti*, 86 N.Y.2d at 454, and concluded that because the plaintiff's injury occurred when he was exposed to and inhaled asbestos prior to his marriage, his wife had no viable claim for loss of consortium, *id.*

Whereas the *Consorti* plaintiff's exposure to asbestos was entirely complete before his marriage, Champagne's injury, in contrast, was not discretely obtained before he married

---

[20] In 1986, C.P.L.R. § 214-c amended the statute of limitations for toxic tort cases from *Schmidt's* last exposure rule – relied on in *Consorti* – to allowing the statute to commence running upon plaintiff's actual or constructive notice of injury.

Plaintiff.  As I stated on the record at the charge conference, a loss of consortium claim might be viable even though the tort ended on September 11, 1968, because ATC's failure to warn of the health hazards and addictiveness of smoking continued to injure Champagne during his marriage in that he had become addicted to nicotine, causing him to continue to smoke.  (*See* 12/5/12 Tr. 2706-11.)  ATC alleges that this gloss does not work under Plaintiff's theory of the case, which assumes that Champagne's addiction was complete pre-September 11, 1968, before his marriage to Plaintiff, and that when Champagne married Plaintiff, he was already affected by ATC's allegedly tortious conduct.  (D's 50/59 Mem. 24; D's 50/59 Reply 12.)  That Plaintiff used addiction as the linchpin of her causation argument does not mean that she conceded that Champagne's addiction was a discrete event that was entirely complete before 1968; to the contrary, the ongoing addiction was a substantial factor in causing Champagne to continue smoking, and ultimately develop lung cancer.  Champagne continued to take the toxic substance (cigarette smoke) from ATC's product into his body for decades after the marriage, *see Consorti*, 86 N.Y.2d at 450 (settled that no damages for loss of consortium "if the alleged tortious conduct and the resultant injuries occurred prior to the marriage"), and the evidence supported the conclusion that he did so (at least in part) because he had become addicted as a young teen before being warned.

     None of the cases ATC cites address an analogous factual situation.  In those cases, plaintiff's pre-marriage injury could be traced to a discrete event.  *See Anderson v. Eli Lilly & Co.*, 79 N.Y.2d 797, 798 (1991) (*in utero* exposure to DES); *Du Bois v. Cmty. Hosp. of Schoharie Co.*, 540 N.Y.S.2d 917, 917 (App. Div. 3d Dep't 1989) (negligent failure to diagnose tumor); *Mehtani v. N.Y. Life Ins. Co.*, 537 N.Y.S.2d 800, 801 (App. Div. 1st Dep't 1989) (employment discrimination); *Briggs v. Julia L. Butterfield Mem. Hosp.*, 479 N.Y.S.2d 758, 758

(App. Div. 2d Dep't 1984) (medical malpractice).  For the reasons stated above and on the

record, ATC's Motions for judgment as a matter of law or a new trial on this basis is denied.

### E.  Damages

Under Federal Rule of Civil Procedure 59, Plaintiff seeks a new trial on certain elements

of damages, alleging that the jury awarded insufficient amounts to Champagne's children for his

wrongful death and to Plaintiff for his pain and suffering and her loss of consortium.  (P's 59

Mem. 1.)  Citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996), Plaintiff

contends that the district court must apply the New York standard for evaluating damages, under

which "an award is excessive or inadequate if it deviates materially from what would be

reasonable compensation," N.Y. C.P.L.R. § 5501(c).[21]  (P's 59 Mem. 11-12.)  A federal court

sitting in diversity should apply state law standards to a motion challenging the size of a damages

award and seeking a new trial.  *See Gasperini*, 518 U.S. at 419, 437-38 & n.22.  "Thus, federal

district courts applying New York law should apply the 'deviates materially' standard, rather

than the federal courts' more rigorous 'shock the conscience' standard to questions of the

adequacy of the verdict."  *Marcoux v. Farm Servs. & Supplies, Inc.*, 290 F. Supp. 2d 457, 474

(S.D.N.Y. 2003) (citing *Gasperini*, 518 U.S. at 437-38).  "New York state-court opinions

confirm that [Section] 5501(c)'s 'deviates materially' standard calls for closer surveillance than

'shock the conscience' oversight," and to determine if a damages award materially deviates,

"New York state courts look to awards approved in similar cases."  *Gasperini*, 518 U.S. at 424-

25.

ATC argues that the New York "deviates materially" standard does not apply because

Section 5501(c) is by its own terms applicable only to motions for additur or remittitur.  (D's 59

---

[21] C.P.L.R. § 5501(c) was enacted in 1986 "as part of a series of tort reform measures," *Gasperini*, 518 U.S. at 423, which sought to "to curb escalating awards . . . [by] creat[ing] a statutory standard designed to give courts greater discretion in monitoring verdicts," *Geressy v. Digital Equip. Corp.*, 980 F. Supp. 640, 653 (E.D.N.Y. 1997).

Opp. 7 n.3 (statute applicable to motion "in which it is contended that the award is excessive or inadequate and that a new trial should have been granted *unless a stipulation is entered to a different award*" (quoting N.Y. C.P.L.R. § 5501(c)) (emphasis added)).)  Because Plaintiff cannot constitutionally seek additur in federal court and may only make a motion here for a new trial to increase the damages awards, ATC asserts that the federal "shock the conscience" standard must be used to analyze the adequacy of the awards at issue.  (*Id.*)

ATC's argument is not persuasive.  While the text of the statute certainly refers to additur and remittitur motions, ATC identifies no case limiting C.P.L.R. § 5501(c) to only these two motions and not a motion for a new trial – which, notably, is also explicitly mentioned in the statute.  Further, courts in this Circuit have analyzed motions for new trials on grounds of inadequate damages under the New York "materially deviates" standard.  *See, e.g.*, *Szabo v. Rodriguez*, No. 09-CV-2048, 2012 WL 6161936, at *1-3 (E.D.N.Y. Dec. 11, 2012); *Johnson v. City of N.Y.*, No. 05-CV-7519, 2011 WL 2693234, at *5 (S.D.N.Y. June 30, 2011).

Finally, ATC argues that Plaintiff's Motion inappropriately seeks to undermine the role of the jury to determine damages, contending that damages awards in personal injury actions are inherently subjective; it is exclusively within the jury's provenance to assess witness credibility and weigh the evidence; and nothing in the record supports the conclusion that the jury did not adequately assess the evidence presented, follow the Court's instructions, and determine the appropriate amount of damages to award.  (*See* D's 59 Opp. 2-6.)  ATC's characterization of the jury's role is correct, but the presumption that the jury followed its instructions, assessed witness credibility, and weighed the evidence does not preclude the possibility that the deliberations yielded damages awards that materially deviated from what would be considered reasonable compensation.  Further, if Plaintiff succeeds on obtaining a new trial on certain elements of

damages, another jury will have the opportunity to perform these same functions.  The critical inquiry in assessing whether a new trial is warranted due to inadequacy of damages is whether the award deviated from similar cases, *see Gasperini*, 518 U.S. at 425, not whether the jury's decision might be disturbed, *see Donlon v. City of N.Y.*, 727 N.Y.S. 2d 94, 97 (App. Div. 1st Dep't 2001) ("Review of jury verdicts often involves questions of fact on which the trier of fact is afforded deference; the issue of material deviation, however, is a mixed question of law and fact which has been legislatively committed to judicial oversight. . . . [W]e cannot, consistent with CPLR [§] 5501(c), attempt to use the rationale of deference to a jury verdict in resolving that issue when we are supposed to compare analogous verdicts.") (internal citations omitted). While the jury's verdict is entitled to deference, *see Szabo*, 2012 WL 6161936, at *3, the New York "materially deviates" standard is less deferential than the federal standard, *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 191-92 (E.D.N.Y. 2012).

    1.  Pain and Suffering Damages

Plaintiff alleges that the $25,000 awarded for Champagne's pain and suffering deviates materially from what would be reasonable compensation for nine months of lung cancer during which the evidence established that Champagne experienced extreme pain, was unable to work or to enjoy the activities in which he engaged before his diagnosis, and suffered humiliation and severe side effects from his chemotherapy and radiation treatments.  (*See* P's 59 Mem. 11-14.) ATC responds that the court should not disturb the verdict because evidence supported the jury's award, in that his medical records reveal that his pain was well managed until the last few weeks of his life, and the award does not materially deviate from what would be reasonable compensation on this factual record.  (*See* D's 59 Opp. 6-9.)

Per *Gasperini*, I must examine awards approved in similar cases, although "[p]rior awards . . . are regarded by the New York appellate courts performing [Section] 5501(c) review as not binding but instructive."  *In re Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998).  Plaintiff cites two cases in which awards for pain and suffering damages for cancer were overturned for being inadequate – including one for the same amount as the award Plaintiff received here under the more pro-defendant federal standard.  *See In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853-54 (2d Cir. 1992) (remanding for new trial on damages because $25,000 for one year of "bodily deterioration" as a result of adenocarcinoma "shock[ed] the conscience" where "the record [was] . . . replete with undisputed testimony of lengthy and intense suffering"); *Frankson v. Brown & Williamson Tobacco Corp.*, 781 N.Y.S.2d 427, 428, 430 (Sup. Ct. Kings Cnty. 2004) (granting additur to $150,000 for approximately six months of lung cancer because $100,000 award "deviated materially" from reasonable compensation), *aff'd sub nom. Frankson v. Philip Morris Inc.*, 818 N.Y.S.2d 772 (App. Div. 2d Dep't 2006).  In asbestos cases involving lung cancers, courts have also sustained large damages awards, or alternatively reduced awards to figures still substantially larger than what the jury awarded Champagne for his pain and suffering.  *See In re N.Y. Asbestos Litig. (Dummitt)*, 960 N.Y.S.2d 51, at *24 (Sup. Ct. N.Y. Cnty. 2012) (unpublished table decision) (reducing jury verdict of $16 million in pain and suffering for thirty-three months to $5.5 million); *In re N.Y. Asbestos Litig. (D'Ulisse)*, 842 N.Y.S.2d 333, 334, 337 (Sup. Ct. N.Y. Cnty. 2007) (denying motion to reduce $10 million pain and suffering verdict for plaintiff who suffered for three years from mesothelioma); *In re N.Y. Asbestos Litig. (Marshall)*, 812 N.Y.S.2d 514, 515 (Sup. Ct. N.Y. Cnty. 2006) (reducing $8 million in pain and suffering for approximately one year to $3 million for one plaintiff and $7 million in pain and suffering for an undisclosed amount of time to $3

million for another plaintiff).  ATC responds that New York courts have also affirmed low pain and suffering awards in wrongful death actions.  *See Tucker v. City of N.Y.*, 388 N.Y.S.2d 133, 133 (App. Div. 2d Dep't 1976) (affirming $20,000 for pain and suffering over a twenty-nine-day period for seventy year-old decedent with an unknown cause of death).

Here, shortly after Champagne successfully quit smoking, he began experiencing headaches and pain radiating down his neck, which rendered him unable to eat because of the severe pain and caused him to lose approximately twenty pounds in three weeks.  (11/15/12 Tr. 289-92.)  Champagne's medical records from the weeks leading up to his diagnosis note that he suffered from a cough; felt pain in his neck, the base of his skull, and chest wall; and experienced gagging and vomiting sensations.  (Jt. Ex. 22 at 381711-00004.)  Shortly thereafter, Champagne received his diagnosis, and was told that his cancer was so advanced that hospice was his best option, but he found another doctor who began chemotherapy immediately in approximately November 2003.  (11/15/12 Tr. 293-94.)  Champagne's cancer was responsive to the chemotherapy, but the side effects he experienced included vomiting, fatigue, and hair loss.  (*Id.* at 294-96; Jt. Ex. 22 at 381711-00020-22.)  During this period, Champagne, a man who never cried, became emotional and cried on his regular phone calls with his daughter because he was worried that he would not be around in the future for his family.  (11/16/12 Tr. 458-59.)  Following chemotherapy, Champagne received radiation treatments during March and April 2004, the side effects of which included fatigue, skin irritation and burns, nausea, diarrhea, and pain and difficulty swallowing because of inflammation of his esophagus.  (11/15/12 Tr. 298-99; 11/27/12 Tr. 1233-35; P's Exs. 6200, 6201, 6203.)

Although Champagne was optimistic following radiation, his condition worsened later in April 2004, when Plaintiff received a phone call from him in which he was confused,

disoriented, and unable to speak in coherent sentences.  (11/15/12 Tr. 303-04.)  Champagne also

called his daughter and told her he did not know where he was or how to get home.  (11/16/12

Tr. 461-62.)  Plaintiff took Champagne to the emergency room, where he could not answer any

basic admission questions and/or identify Plaintiff as his wife.  (11/15/12 Tr. 305.)  Shortly

thereafter, Champagne learned that his lung cancer had metastasized to his brain, and he opted to

pursue immediate radiation treatment, during which he wore a mesh mask over his head, which

was fastened to the table to ensure the radiation hit the proper locations.  (*Id.* at 305-08.)

Plaintiff explained that Champagne felt he had no choice but to undergo brain radiation because

the continued loss of his faculties was not an option when he still had business to resolve, such as

determining how best to provide for Plaintiff and his children.  (*Id.* at 307.)

Eventually the cancer spread throughout Champagne's body, including to his bones,

which caused severe bone pain that became progressively worse in the last weeks of his life.  (*Id.*

at 308-09.)  Shortly before Champagne passed away, he was in too much pain to ride in the car

to watch his daughter ride in a horse show or to walk from the car into his doctor's office.  (*Id.* at

312-14.)  Champagne's emergency room records from June 21, 2004, indicate that he was

experiencing extreme pain, nausea, and fatigue, and had no appetite or bowel movements.  (Jt.

Ex. 11 at 381699-00040-41, 46-49, 92-93.)  Champagne's condition worsened until he slipped

into a coma, and he passed away on June 25, 2004, approximately nine months after his

diagnosis.  (11/15/12 Tr. 314-15.)  Contrary to ATC's argument that Champagne primarily

experienced pain only in the last two weeks of his life, (*see* D's 59 Opp. 7-9), the testimony and

medical records indicate that he experienced pain from fall 2003 until he passed away, which his

doctors managed in part through prescription medications like morphine, Percocet, Xanax, and

oxycodone, (*see, e.g.*, Jt. Ex.4 at 381685-00002; Jt. Ex. 11 at 381699-00047; Jt. Ex. 22 at 381711-00004, 7, 9, 49.)

Quantifying pain and suffering in dollars is subjective.  That "there exists an infinite variety of people who will experience different reactions to similar tragedies further compounds the difficulty of quantifying a reasonable verdict." *Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d at 312.  Although it is almost impossible to find cases where all the relevant factors are the same, the court must review "the totality of circumstances of the proffered sample cases to ascertain whether they can provide a basis for comparison." *Id.* (internal quotation marks omitted).  The damages awarded in the asbestos cases Plaintiff cites generally deviate substantially from the award here, although the type of lung cancer suffered differs and the length of suffering in the cases cited all exceed nine months, but the Second Circuit did hold in *Brooklyn Navy Yard* that a small award – $25,000 – for pain and suffering for one year shocked the conscience.  I recognize that many of the asbestos cases cited by Plaintiff involve reduction of excessive awards, and that remittitur represents the maximum amount of damages permissible on the facts presented, not necessarily the bare minimum that could be deemed adequate on similar facts.  On the other hand, ATC's citation to *Tucker* is unavailing because, while the amount of damages awarded is similar, it is unclear what injury the decedent suffered.  Even if it was similar to Champagne's, the length of suffering – less than one month – was far shorter.  The most closely analogous case is *Frankson*, where the court held that a $100,000 award for six months of lung cancer caused by smoking was inadequate and granted plaintiff's motion for additur to $150,000.  *Frankson*, 781 N.Y.S.2d at 428, 430-31.  The *Frankson* court provides no details of the decedent's pain and suffering, but the decedent and Champagne both battled the same disease for reasonably similar periods of time.

Mindful that determining pain and suffering damages is a highly subjective process and that the jury's verdict is entitled to deference, the $100,000 awarded initially and deemed insufficient in *Frankson*, the most closely analogous case, is still four times larger than the award Plaintiff received here.  Thus, I agree with Plaintiff that the $25,000 award here materially deviates from what would be considered reasonable compensation.  Moreover, Plaintiff presented evidence of substantially larger awards in cases involving similar diseases, as well as an instance where the Second Circuit deemed conscience-shocking the same award as here where there was – also as here – evidence of "bodily deterioration" and "undisputed testimony of lengthy and intense suffering."  *Brooklyn Navy Yard*, 971 F.2d at 853-54.  Given the copious evidence presented at trial of Champagne's pain and suffering during the nine months he fought cancer, I find the jury's $25,000 award for his pain and suffering to be "seriously erroneous," warranting a new trial on these damages under Rule 59(a).

2.  Loss of Consortium Damages

Plaintiff argues that the $20,000 awarded in loss of consortium damages also materially deviates from reasonable compensation, citing cases approving such awards ranging from $176,000 to $2.5 million.  (P's 59 Mem. 15-16.)  ATC responds that the evidence admitted did not focus on Plaintiff's marital relationship with Champagne or any losses she experienced, and that the damages awarded here were reasonable.  (D 59 Opp. 9.)

Plaintiff's testimony focused on how Champagne's illness forced her to take on roles he traditionally performed for the family, and she also noted in conclusory fashion that their intimacy changed after his diagnosis.  (*See* 11/15/12 Tr. 325-27.)  This testimony did not approach that in the cases Plaintiff cites.  For example, the spouse in *Garrison v. Lapine*, 900 N.Y.S.2d 770, 773 (App. Div. 3d Dep't 2010), "assume[d] the duties of [plaintiff's] nurse" and

the "role of household caretaker," and plaintiff's traumatic brain injury caused "marital turmoil,"

including "a threat to kill her husband, forcing him to leave the marital residence for several

weeks," *id.* In another case, a substantial loss of consortium award was upheld because "the

quality and extent of [the couple's] sexual practices [had] been drastically altered" due to

plaintiff's positive HIV status. *Doe v. State*, 595 N.Y.S.2d 592, 595 (App. Div. 4th Dep't 1993).

The evidence regarding Plaintiff's marital relationship does not establish similar losses, and I

cannot say that her damages award materially deviated. Thus, I decline to grant a new trial on

loss of consortium damages.

      3.  <u>Billy & Jennifer Champagne's Damages</u>

      Plaintiff also argues that the jury's award of no damages to Billy and Jennifer

Champagne materially deviated from reasonable compensation because the evidence established

that the children lost extensive parental care and guidance as a result of Champagne's death.

(P's 59 Mem. 19-20.) ATC responds that the evidence supported the jury's verdict. (D's 59

Opp. 10-11.)[22] Specifically, ATC notes that Jennifer was a twenty-one-year old college student

when her father passed away, and today she is a successful personal injury attorney in New

York. (*Id.*) Billy was nineteen at the time of his father's death, and today he has earned a

master's degree and works at a local college. (*Id.*)

      Plaintiff cites several cases in which children and grandchildren of decedents received

damages awards. *See Gonzalez v. N.Y.C. Hous. Auth.*, 77 N.Y.2d 663, 666 (1991) (affirming

recovery of $100,000 in damages for financially independent surviving grandchildren, ages

---

[22] ATC also argues that Plaintiff's counsel expressly asked the jury to award damages exclusively to Plaintiff, in that
he requested in his closing argument, that "if you award economic loss . . . that you put it on the Eileen Clinton
line." (12/7/12 Tr. 3042.) It is clear in context that counsel was referring to economic damages, not damages for
loss of parental care and guidance. Moreover, the jury is presumed to follow the instructions given, and the jury was
instructed to determine "what portions of his available earnings [] Champagne would have applied in the future to
the care and support of his children." (12/10/12 Tr. 3083.)

twenty-one and nineteen, following murder of grandmother); *Bennett v. Henry*, 833 N.Y.S.2d

619, 621 (App. Div. 2d Dep't 2007) (upholding damages of $133,000 to twenty year-old

grandson and $43,000 to adult daughter of decedent killed by driver while attempting to cross

street); *Kiker v. Nassau Cnty.*, 571 N.Y.S.2d 804, 805-06 (App. Div. 2d Dep't 1991) (upholding

$325,000 damages for medical malpractice to decedent's five children ages fifteen, nineteen,

twenty-three, twenty-seven, and thirty-two).  ATC correctly argues that Plaintiff's cases only

show that adult children may recover for the loss of parental care and guidance, not that they

must recover, citing *Motelson v. Ford Motor Co.*, 957 N.Y.S.2d 341, 346-47 (App. Div. 2d Dep't

2012), where the jury made no award to the adult children of decedent in automobile accident.

But these cases are relevant to the material deviation analysis.

Here, Billy Champagne, who was nineteen when his father passed away, testified that his

father was his "best friend" and "everything to [him]," and taught him "how to be everything

[he] [is] today."  (11/20/12 Tr. 921.)  Billy was born with cerebral palsy, which affects the

tendons in his legs and back and causes chronic pain.  (*Id.* at 922-23.)  Billy described how the

cerebral palsy affects his balance, and he remembered that his father "was always there to catch

[him]."  (*Id.* at 924.)  Champagne attended Billy's four surgeries, including accompanying him to

the operating room and spending the night by his side in the hospitals.  (*Id.* at 924-25.)  Billy

stated that his father's support was instrumental in his surgeries, and he did not think he could

face surgery now without his father at his side.  (*Id.* at 940-41.)

Billy accompanied his father to work as a young child, and at age fifteen, Billy began

washing trucks and helping with the billing and payroll at Champagne's trucking company.  (*Id.*

at 926-27.)  Eventually, Billy's responsibilities increased to dispatching trucks and participating

in meetings discussing ordering equipment and hiring and firing employees.  (*Id.* at 927.)  Until

Champagne's death, Billy worked approximately thirty to thirty-five hours per week at the company, where his desk was located directly next to his father's.  (*Id.* at 927-28.)  Billy testified that his father had planned for the two of them to run his business together as a father-and-son team after Billy graduated from college.  (*Id.* at 939-40.)

Billy pursued his bachelor's and master's degrees following Champagne's passing because his father had asked him to finish his education, and he currently lives with his mother. (*Id.* at 918-19, 941.)  Billy stated that he misses working for his father's business and the support and advice his father provided to him.  (*Id.* at 941.)  Rather than a managerial job at his father's business – now sold – he currently has a clerical job in admission processing at a local college. (*Id.* at 918-19.)

Jennifer Champagne described herself as a "daddy's girl," who bonded with Champagne over their shared love of horseback riding.  (11/16/12 Tr. 450.)  She stated that her father was always there for her events, and after she left home, they spoke on the phone at least twice per day.  (*Id.* at 450, 455)  She described her father as her "protector" and "support system," who she called whenever she had trouble, as well as every day just to talk.  (*Id.* at 457, 463-64.)  Jennifer described losing her dad as losing "everything" because Champagne was "the best dad you could ever ask for."  (*Id.* at 463.)  She gave up horseback riding after his death because it was not the same without him.  (*Id.* at 464.)  During her father's illness, Jennifer was a college student supported entirely by him, (*id.* at 456-57), and Champagne, a successful businessman, likely would have continued to support her through law school, particularly as she testified that her father always gave her everything she asked for or needed, (*id.* at 445-46, 457).

I agree with Plaintiff that the award of no damages to Champagne's children for his wrongful death materially deviates from what would be reasonable compensation.  Although

ATC identifies a case where the adult children of a decedent received no damages award, the case engages in no analysis of the propriety of the verdict and only notes that wrongful death damages were available to the distributees of the decent – his wife and adult children – and that the jury awarded wrongful death damages only to his wife.  *See Motelson*, 957 N.Y.S.2d at 346-47.  On the other hand, Plaintiff cites several cases where the adult children received damages for their loss of parental care and guidance.  The evidence in this case established that both children had extremely close relationships with Champagne, and losing him while they were young adults was a substantial loss for both.  The relationship Billy and Jennifer had with Champagne is at a minimum similar to *Gonzalez*, where the adult grandchildren of the decedent visited their grandmother every other day for dinner and relied on her for support with personal issues, including marital problems and care for a mentally ill family member, and recovered $100,000 in wrongful death damages.  *See Gonzalez*, 77 N.Y.2d at 670.

Moreover, the jury was instructed here that Champagne was "not legally obligated to contribute to the support of any child who became [twenty-one] years old," but could have "continue[d] to support a child who was older than [twenty-one], or could have stopped supporting a child under [twenty-one] who became self-supporting."  (12/10/12 Tr. 3083.)  On a motion for a new trial, the court is permitted to "weigh the evidence and assess the credibility of the witnesses."  *Scherer*, 284 F. App'x at 854.  I find that it is against the weight of the evidence that Billy, who was nineteen at the time of Champagne's death, had become self-supporting. While Billy did have a nearly full-time job, he worked for his father's company, and the weight of the evidence indicated that Champagne would support him financially until at least age twenty-one – and, given his health condition, likely long after that age as well.  Jennifer continued on to law school following college, and given that her father supported her financially

and emotionally (through daily phone calls) as an undergraduate, it is likely that he would have continued to support her as a graduate student.  Although it is not appropriate to disturb a verdict that relies upon a jury's assessment of a witness's credibility, *Ellis*, 567 F. Supp. 2d at 610, the instances ATC cites – Billy's inconsistent testimony about a statement made to his father regarding his smoking and Jennifer's job as a personal injury lawyer – could have inflicted only minimal damage to their emotional testimony about the loss of their father, which was corroborated by photographs and Plaintiff's testimony.  Given the strong evidence of Billy's and Jennifer's losses, I find the jury's failure to award damages for those losses to be "seriously erroneous," warranting a new trial on those damages under Rule 59(a).

ATC argues that even if the damages award materially deviates, liability and damages cannot be severed here, thus precluding a new damages-only trial.  (D's 59 Opp. 14.)  It contends that the key damages witnesses (Plaintiff and her two children) testified regarding both liability and damages, and the jury may have properly rejected in whole or in part the testimony of these witnesses based on their credibility or financial interest in the case.  (*Id.* at 15-16.)

I disagree that damages and liability are inextricably linked here.  First, "where the jury has addressed the issues of liability and damages separately and there is no basis for inferring that the finding on liability was a compromise verdict or was otherwise procedurally flawed, the new trial may be limited to . . . damages."  *Kerman v. City of N.Y.*, 374 F.3d 93, 132 (2d Cir. 2004); *accord Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17 (2d Cir. 1992) ("A new trial on damages only is not proper if there is reason to think that the verdict may represent a compromise among jurors with different views on whether defendant was liable or if for some other reason it appears that the error on the damage issue may have affected the determination of liability.") (alteration and internal quotation marks omitted).  The jury here rendered separate

verdicts on liability and damages pursuant to a special verdict form that asked it to assess each element of the substantive claims, and then to consider damages only if it found for Plaintiff on every element of a substantive claim.  Although ATC argues that the verdict may have been the result of a compromise over liability and damages, this assertion is pure speculation.  An offhand remark by the jury foreperson about removing sharp objects from the jury room after beginning deliberations, (*see* 12/10/12 Tr. 3111), does not indicate that the jury compromised on liability – particularly absent any other indications that the jury was at an impasse or was having difficulty deliberating.[23]  "An inadequate damages award, standing alone, does not indicate a compromise among jurors," *Diamond D Enters.*, 979 F.2d at 17, and "'*absent obvious inconsistencies* we will not presume that the jury's findings represent anything other than good faith responses to the questions presented,'" *Fox v. City Univ. of N.Y.*, 187 F.R.D. 83, 96 (S.D.N.Y. 1999) (emphasis in original) (quoting *Crane v. Consol. Rail Corp.*, 731 F.2d 1042, 1050 (2d Cir. 1984)).  Because the jury addressed liability and damages separately in the first instance, and there are no indications that the liability verdict was the result of a compromise or otherwise procedurally flawed, a new trial limited to the issue of Billy and Jennifer Champagne's damages is appropriate.

### F.  Pre- and Post-Judgment Interest

Under Federal Rule of Civil Procedure 59, Plaintiff moves to amend the judgment to include pre- and post-judgment interest.  (P's 59 Mem. 1.)  Regarding pre-judgment interest, Plaintiff and ATC agree the appropriate date from which to compute pre-judgment interest in

---

[23] Such a comment cannot be read to reflect anything more than the ordinary conflicts that often become apparent when deliberating jurors initially state their views.  The deliberation process almost always resolves those conflicts, as it did here.

wrongful death damages is September 21, 2008, (P's 59 Reply 1 n.1),[24] and it is undisputed that Plaintiff is entitled to pre-judgment interest on wrongful death damages at 9% interest under New York law, *see* N.Y. Est. Powers & Trusts Law § 5-4.3(a), N.Y. C.P.L.R. § 5004, totaling $496,080, (*see* D's 59 Opp. 20).  Plaintiff's Motion to amend the judgment to include this amount of pre-judgment interest is accordingly granted.

Regarding post-judgment interest, Plaintiff asserts that she is entitled to post-judgment interest from December 19, 2012 (the date judgment on the jury's verdict was entered), until the date of payment, at the statutory interest rate computed daily and compounded annually.  *See* 28 U.S.C. § 1961(a)-(b).  ATC does not oppose Plaintiff's application.  Plaintiff's Motion to amend the judgment to include this amount of post-judgment interest is granted as unopposed.

---

[24] "P's 59 Reply" refers to Plaintiff's Reply Memorandum in Support of Plaintiff's Motion to Modify Judgment to Include Pre- and Post-Judgment Interest and Motion for New Trial on Certain Elements of Damages Only.  (Doc. 401.)

## IV.  Conclusion

For the reasons stated above, ATC's Motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 or a new trial pursuant to Federal Rule of Civil Procedure 59 is DENIED.  Plaintiff's Motion is GRANTED IN PART and DENIED IN PART.  The Court denies Plaintiff's Motion under Federal Rule of Civil Procedure 59 for a new trial on loss of consortium damages, but grants Plaintiff's Motion to amend the judgment to include pre- and post-judgment interest and her Motion under Rule 59 for a new trial on damages for William Champagne's pain and suffering and for Billy and Jennifer Champagne's losses.  The Court will wait to enter the amended judgment, however, until after the new trial.

The Clerk of the Court is respectfully directed to terminate the pending Motions.  (Docs. 391, 393.)  The parties are directed to appear for a status conference on July 9, 2013, at 2:00 p.m.

**SO ORDERED.**

Dated:  June 20, 2013
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.